1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

2

3

- - - - - - - - - - - - - -x    ORIGINAL

STEPHEN WOODRUFF,                :

4

        Plaintiff,          :

5

   v.                           : Case No.: 1:06-CV-00832(RLJ)

6

NATIONAL OPINION RESEARCH        :

7

CENTER,

                       :

8

        Defendant.          :

9

- - - - - - - - - - - - - -x

                     Tuesday, November 28, 2006

10

                     Washington, D.C.

11

Deposition of

12

STEPHEN WOODRUFF

13

plaintiff, called for examination by counsel for the

14

defendant, pursuant to notice, at the offices of David Burns,

15

Esquire, 815 Connecticut Avenue, N.W., Suite 500, Washington,

16

D.C. 20006, beginning at 10:00 a.m., before Sharon

17

Mitrothanasis a notary public in and for the State of

18

Maryland, when were present on behalf of the respective

19

parties:

20

21

22

23

24

25

15

1    Q    Let's just talk about you.  So, when you left the

2  Postal Service you retired, is that right?

3    A    Yes, that's correct.  I retired on the 23rd of

4  February 2005 in order to come to work at NORC.

5    Q    Okay.  Let's back up.  While you were employed at

6  the Postal Service, in addition to the base salary between

7  $90-91,000 as you mentioned, you said that you received

8  about $10,000 in medical benefits.

9    A    Yes.

10    Q    What were those medical benefits?

11    A    The medical insurance, Blue Cross and Blue Shield.

12  I paid around 15 percent and the Federal Government paid the

13  other 85 percent or the Postal Service.

14    Q    And did that cover both health and dental?

15    A    No.  No dental.

16    Q    All right.  Did you receive any dental insurance

17  while you were at the --

18    A    No.

19    Q    -- Postal Service?

20    A    It might have been available but I have very good

21  teeth so I didn't worry about it.

22    Q    And so the $10,000 in medical benefits is the Blue

23  Cross Blue Shield medical insurance you're referring to?

24    A    Yes, that's correct.

25    Q    Did you receive any other benefits while you were

1     Q    And when you actually retired you had to submit

2 paperwork --

3     A    Yes.

4     Q    -- or just tell somebody?

5     A    Yes.  You submit a form.  It's a long, involved

6 process.  It takes about a month to process it and you have

7 to go through a fairly long and involved checklist to make

8 sure that you've dotted all the i's and crossed the t's so

9 to speak.

10     Q    Is there an initial form you file or you just send

11 a letter?

12     A    Yes. it's a 2801.  It's a request for immediate

13 retirement, I believe is the name of it.  It might not be

14 exactly.  But, it is the form 2801 and it's a four page

15 form; fill it out; send it to HR.  I signed mine on the 12th

16 of January 2005 and HR has it date stamped on the 13th of

17 January at 1:10 p.m. which is when they received it.

18     Q    How do you know the precise dates and times?

19     A    I have a copy of the form at home.

20     MR. BURNS:  Oh, Nick, --

21     MR. HANTZES:  Yes?

22     MR. BURNS:  That's clearly a response to the

23 document request and when we asked previously you indicated

24 he didn't have any documents relating to his separation from

25 the Postal Service.  Can we get that?

23

1    gave a copy of it back, but, at some point during the

2    following month they did.

3        Q    Okay.  So you physically took your signed form

4    2801 to the HR office on January 13th?

5        A    Either 12th or 13th.

6        Q    Either the 12th or 13th.

7        A    But, it probably was the 13th.

8        Q    And your retirement, it's a full retirement,

9    right, not an early retirement?

10       A    Yes, yes.

11       Q    And you started to tell me a little bit ago about

12   the retirement monies.  Why don't you tell me, in what form,

13   one, in what form do you receive your retirement monies?  Is

14   it a pension, an annuity, the same thing?

15       A    It's an annuity.  I think that's the correct term

16   for it.  It's an amount that we get paid at the end of --

17   or the date is actually the first of the month.  It's

18   inflation index to the CTI like social security.

19       Q    Okay.  And what is the -- you were explaining to

20   me before that the retirement has two components.  One was

21   between 60-65 percent of your high three years of pay?

22       A    That's it.  The retirement - oh, I was talking

23   about the increase when I said it had two components, the

24   increase in my retirement, expected retirement income, if I

25   were to stay with the government.  It two increases.  One,

32

1    Q    Have you --

2    A    No.

3    Q    -- since 2004?

4    A    No.

5    Q    When did you first learn about NORC?

6    A    At least 20 years ago.

7    Q    And how so?

8    A    At annual conventions.  They have presentations.

9  They have an employment booth and their staff is generally

10 fairly active in the conventions for the American -- they're

11 called the Joint Statistical Meetings of the American

12 Statistical Association.  And I have been very active, not

13 just in the agencies where I've been employed since I began

14 as a statistician, but, in the professional community

15 outside the government as well through these meetings and

16 publications.

17    Q    And you've been active throughout your career at

18 BLS and the Postal Service?

19    A    Yes.

20    Q    Could you return to Federal Government employment

21 at this point?

22    A    Theoretically, yes, but, I think it's hard and I

23 have sent applications and inquiries, but, I don't even get

24 a telephone call or a response so I think there might be a

25 little implicit problem with looking for a job when you're

1  quite loosely, is that correct?

2      A    Yes.

3      Q    Was it you submitted a resume?

4      A    Loosely.  I'm not sure whether -- I must have sent

5  them a resume at some point, but, I was referred to them

6  through Partha Lahiri who was the statistics professor at

7  University of Nebraska, I believe, in 2000 and moved to the

8  University of Maryland in 2001 or 2002, somewhere around in

9  there.

10     Q    And were you using a headhunter at the time?

11     A    I don't think so.  I don't think so.  Bob Warseck

12 I was involved with I know two years ago.

13     Q    And who is Bob Warseck?

14     A    He was a headhunter.

15     Q    And you said you were involved two years ago.  How

16 so?

17     A    He got involved in the NORC thing one way or the

18 other, but, I'm not sure how and it might have been through

19 Partha Lahiri again.  But, what really -- in 2004, or, let's

20 see, yes, it was 2004 I interviewed with Rachel at the Joint

21 Statistical Meetings somewhere.  Maybe it was Toronto.  I'm

22 not sure now.

23     Q    So, could have been then Bob Warseck was in 2002

24 when you --

25     A    No, I don't think a headhunter was involved in

37

1  2002.  I think maybe John Thompson had contacted Partha

2  Lahiri for people or vice-versa.  But, I don't think one was

3  involved in 2002.  And, later in 2004, I'm not sure how much

4  he was involved either since the main contact was with

5  Rachel Harter at the Joint Statistical Meetings.

6      Q    So, in 2002 were you looking to leave the Postal

7  Service?

8      A    I was considering it because I was eligible to

9  retire in 2002 and I could go around and look for other

10  options and I was exploring them.

11      Q    Did you apply to any other places other than NORC

12  in 2002?

13      A    Yes.  Oh, not in 2002.  Just NORC.

14      Q    What about in 2003?

15      A    No.  Not until 2004.  The same time I talked to

16  Rachel I talked to several other similar organizations that

17  do survey work.

18      Q    And this was at the Joint Statistical --

19      A    Yes, at the Joint Statistical Meetings.

20      Q    And did you interview with any other?

21      A    Yes.  I interviewed with Battelle and with

22  Research Triangle Institute.

23      Q    I'm sorry, what was the first one, Battelle?

24      A    Yes.  B-A-T-T-E-L-L-E, I believe.

25      Q    Is that an entity, a research entity of some sort?

39

1    A    I think so, but, there were some meetings every

2  summer and in cities all over North America so they tend to

3  get blurred after a while.  I know I've been to Toronto a

4  couple of times.  I vaguely remember it was in Toronto.

5  This year it was different.  They went to Seattle and that

6  was a whole new thing going out to that particular city.  I

7  don't think they've ever been there.

8    Q    And the 2004 one, do you remember what month that

9  was held?

10    A    They're all in August every year.  That's one

11  thing they all have in common, not the location.

12    Q    And did you submit your resume to NORC at the JSM

13  in August 2004?

14    A    Yes.

15                            (Deposition Exhibit No. 1 was

16                             marked for identification)

17        BY MR. BURNS:

18    Q    Mr. Woodruff, you have before you what's been

19  marked as Woodruff Exhibit No. 1.  Do you see that document?

20    A    Yes.

21    Q    And do you recognize this document?

22    A    Uh-hmm.

23    Q    And what is it?

24    A    This is my resume.

25    Q    And is this the resume you submitted to NORC at

40

1    the JSM in August 2004?

2        A    Yes.    Probably is or something very, very similar

3    to this.    If they say it is I'm sure it is.

4        Q    Well, can you look at it and tell?

5            MR. HANTZES:    What was the question?    What the

6    question?

7            MR. BURNS:    Was this the resume he submitted to

8    NORC at the JSM.

9            MR. HANTZES:    Oh.

10            THE WITNESS:    It doesn't actually have a date when

11    it was produced, but, this could definitely be it.

12            BY MR. BURNS:

13        Q    You see the number at the top right-hand corner of

14    each page?

15        A    Yes.

16        Q    The 114?

17        A    Yes.

18        Q    Do you know what that is?

19        A    No.

20                            (Deposition Exhibit No. 2 was

21                                marked for identification)

22            BY MR. BURNS:

23        Q    Mr. Woodruff, you have before you what's been

24    marked as Woodruff Exhibit No. 2.    Do you see that document?

25        A    Yes.

41

1    Q    And do you recognize this document?

2    A    Yes.  This is my application form for NORC

3    apparently.

4    Q    And if you'll look at the very last page towards

5    the bottom it says applicant's signature and there's a

6    signature next to it.  Is that your signature?

7    A    Yes.  Yes, that's right.

8    Q    And then there's a date there, 13 August 2004.  Is

9    that your handwriting?

10    A    Yes.

11    Q    So, was this something you completed at the JSM?

12    A    I don't know whether I completed it at the JSM or

13    shortly thereafter.  It could have been either.

14    Q    Do you recall whether you filled out the

15    application before or after submitting your resume?

16    A    It would have been after.  I'm almost certain.

17    Q    How does that work at the JSM?  Do you submit your

18    resume for particular entities or companies or is there

19    essentially a resume bank?

20    A    I believe there's both.  I think you can put your

21    resume in a book and a company can flip through them and

22    contact you and you can also look through the companies that

23    looking for people at your similar skills and contact them.

24    Q    And do you know, do you recall what you did in

25    August 2004 with your resume?

44

1   speculation is what goes on in the interviews, but,

2   specifically what we talked about I don't know other than

3   what i've stated.

4        Q    Then what happened?

5        A    Rachel called me a couple of months later and said

6   we're interested.  Based on the date of the interview, I

7   believe it was 10 December 2004, I would say she probably

8   called me November.

9        Q    And you recall the date as being December 10,

10  2004?

11       A    No, I've seen that date as the date that I was

12  interviewing in Chicago and talked to Kirk Wolter and Rachel

13  and several other employees there, Kirshna Winfrew and Steve

14  Pedlow and one or few other folks.  I can't remember their

15  names.

16       Q    And where did you see that date?

17       A    Probably in a deposition, but, I'm not sure.  It's

18  some of the paperwork that has been floating around here the

19  last month or so.

20       Q    Okay.  Was that in preparation for your deposition

21  that you were given that paperwork?

22            MR. HANTZES:  Objection.  He already answered that

23  he looked at the deposition, so, what's your question?

24            MR. BURNS:  Asked and answered will suffice, Nick.

25            MR. HANTZES:  The question is vague.  Objection.

49

1      A    When I wrote this, yeah, that date was a little

2  premature, but, I signed this in August and I hadn't

3  computed out exactly when I wanted to schedule that

4  retirement date so I put down January of 2005 but it turned

5  out to be February of 2005.

6      Q    Okay.  And why weren't you available sooner than

7  January 2005?

8      A    Well, in theory, I was available in September of

9  2004, but, I didn't want to and I hadn't made any decisions

10  then and, so, these dates are approximate based on my

11  feelings, the dates I sign this way back in August.

12      Q    Okay.  So what happened after the JSM in August of

13  04?  I think you mentioned earlier that you got called in

14  for an interview or something.  Why don't you tell me what

15  happened with NORC after the JSM in August of 04?

16      A    In November, I believe, I was called by Rachel and

17  I don't now that I had any contact from her between the

18  interview in August and the time I filled this out and when

19  she called me in November.  I don't recall any contact, but,

20  there might have been and finally in November she called and

21  said that she was interested in considering me.

22      Q    And what else did she say?

23      A    Well, come on down and talk to us or come on up to

24  Chicago and talk to us. So she organized a -- I flew in in

25  the morning and out in the afternoon and I don't think I

50

1  stayed overnight there.  I'm pretty sure I didn't.  So, I

2  organized the usual like the one I had three years

3  previously or two years previously.  Flied up to Chicago and

4  had an interview schedule starting around nine or ten in the

5  morning and going through until around three in the

6  afternoon.  I flew out.

7      Q    And did she say anything else on that phone call?

8      A    Not that I recall.

9      Q    And what did you say?

10     A    Yes, I'll come.

11     Q    And did you eventually go to Chicago to interview

12  with NORC personnel?

13     A    Yes.  Apparently, if the documents that I read are

14  correct, on the 10th of December.  Until I read those in the

15  last week or so I didn't know the date exactly.  I just know

16  it was December.

17     Q    And between the time that you received that call

18  from Rachel in about November of 2004 and the date that you

19  were in Chicago interviewing did you have any other

20  communications with Rachel?

21     A    I don't remember.  These interviews also could

22  have been set up by someone in personnel who might have been

23  in charge or someone other than the vice-president who might

24  have been in charge of making the arrangements, the flight,

25  the tickets and it probably was in fact and that is the

52

1    A    No, but, it looks familiar and I would have

2 received something like this by e-mail or when I arrived

3 there.    The date , as you see the times pretty much agree

4 with what I stated a few minutes ago as far as the interview

5 schedule starting in the middle of the morning going to

6 around three in the afternoon.

7    Q    So, take your time.    In looking at this document,

8 including the date, and the times, and the people

9 identified, to the best of your recollection does it seem to

10 reflect your interviews with NORC in Chicago?

11    A    Yes, this looks about right.

12    Q    Okay.    The first name there that I see other than

13 yours is Yvonne Johnson.    Do you know who she is?

14    A    Yes.    She's their HR representative and I don't

15 think Yvonne actually talked to me.    I think there was

16 somebody who worked for her was the one who took over this.

17 I have a vague memory that she was in the hospital that day

18 for something but, you know, I could be completely off on

19 that.

20    Q    Do you recall any thing discussed with that person

21 that may have taken over for her?

22    A    No.

23    A    Okay.    All right.    Then let's go down.    The next

24 name is Kirk Wolter.    Let's skip Mr. Wolter for a second.

25 And then the next name is Hee-Choon Shin.

1  would understand that or about any statistical issues, but,

2  i wasn't going to be introduced to RECS itself until I

3  started asking Rachel to start sending material on the

4  things that I might be working at when and if I started

5  working at NORC and there was, of course, some minor

6  problems with that because of confidentiality and giving the

7  information out to somebody who wasn't actually working

8  there.

9      Q    And that was after you had accepted employment

10 with NORC?

11     A    Not officially, although it could have it.  It

12 could have been after I officially accepted it.  It probably

13 was because there was a gap of nearly six weeks between the

14 time I official accepted the employment and came on the 28th

15 of February.

16     Q    Do you remember anything else from your meeting

17 with Kirshna Winfrew in terms of what was said?

18     A    No. She seemed like a very nice, personable

19 individual, but, as far as specifics beyond generalities

20 about household surveys, I don't know.

21     Q    And then next, skip over the next name, Rachel

22 Carter, for  second and go to Steven Pedlow.

23     A    Yes.

24     Q    Who is he?

25     A    He's their imputation expert.  And all these

59

1       A    He is one of their vice-presidents and he used to

2   work at the Census Bureau.    He's written fairly standard

3   text on variance estimation that they use at NORC and a lot

4   of other places.    It's one of the classics I think in that

5   it was one of the first books that covered all the various

6   techniques for air variance estimation from survey data.    He

7   wrote it while he was at the Census Bureau and you'll

8   probably find it in a lot of offices unless it's been

9   superseded in the last ten years, but, I believe it was

10  published in the 80's and it was the only book of its kind

11  for a fair number of years after that, say ten years or so,

12  and could still be the only one like it.

13      Q    Did you have any interaction with him when he was

14  at the Census Bureau?

15      A    No.   He mentioned that I worked at the Census

16  Bureau in his deposition but I never worked at the Census

17  Bureau.   And my only interaction with him was that I studied

18  under him when I was doing sampling theories for one year at

19  George Washington University.

20      Q    And returning to Exhibit 3, the interview in

21  Chicago with Mr. Wolter, where did you meet?

22      A    In his office.

23      Q    And what was discussed?

24      A    We talked about what he thought I  might be

25  working on there and in particular I remember questioning

1   him about and been made apparent to me by Rachel and other

2   people that I talked to that I was being hired to fill

3   requirements, additional requirements placed on NORC by

4   their recent acquisition of the National Immunization Survey

5   so I was quite concerned with that and I asked him

6   specifically is this is a solid project and am I going to

7   retire and come over here and is this requirement for the

8   extra staff that they need to meet the staffing requirements

9   imposed by the NIS going to last for a while and he said yes

10  and because that, of course, was one of the prime factors.

11  It wasn't going away probably.

12          NORC is a good organization.  It has a good

13  reputation where they get a contract they will probably keep

14  it and satisfy their client which is one of the reasons that

15  I was going there and also the reason I was being hired.

16          So, that was one of the things that I discussed

17  with him.  And the others were probably less memorable.  I

18  think I, of course, told him about the work I was doing at

19  the Bureau of Labor, not Bureau of Labor Statistics, but,

20  the Postal Service and that we might find a contract with

21  them sometime in the vague future working on the redesign

22  work that I was in the middle of when I left the Postal

23  Service.

24      Q    What exactly did Mr. Wolter say specifically?

25          MR. HANTZES:  Asked and answered.

BY MR. BURNS:

Q    What exactly did Mr. Wolter say?

A    Specifically, I don't remember the exact words, of course, but, he said that we have this contract that's solid and if it's the basis for you coming over here you can pretty much depend on it.  It's going to be roughly five years in duration if we don't get it renewed and if we do it could go on indefinitely.

Q    So, that was your impression?

A    Right.  Yes.

Q    Now, you said earlier --

MR. HANTZES:  Objection.  Are going to allow me to say the word objection and complete my objection?  You really need to play by your own rules.  Objection. Mischaracterizes his testimony.

MR. BURNS:  You made your objection.

BY MR. BURNS:

Q    Mr. Woodruff, --

MR. HANTZES:  Counsel, counsel, --

MR. BURNS:  You made your objection.  I didn't say anything.

MR. HANTZES:  It's very important for you to understand that providing the right to counsel to make his objection and complete it is just as important as your right to ask the question and if you don't respect that right

1    Q    Okay.  Back to your meeting with Ms. Harter.  You

2  met with her in Chicago when you were out there

3  interviewing, correct?

4    A    Yes.

5    Q    And where did you meet with her?

6    A    In the -- excuse me -- in the placement facility

7  at the Joint Statistical Meetings.

8    Q    No, I'm sorry, in Chicago.

9    A    Oh, in Chicago.  Oh, in her office, yes.

10   Q    And was anybody else present other than the two of

11  you?

12   A    No.  Maybe I shouldn't say absolutely no to that.

13  I'm really not sure if anyone else was present at that

14  meeting.

15   Q    And what was discussed during that meeting or

16  interview with Ms. Harter?

17   A    The kind of work that -- I think it got a good

18  deal more specific on the kind of things that I had doing

19  with the Postal Service and how they would fit in with NORC

20  activities and I don't think we had gotten specific as

21  deciding what survey I would be working on at that point.

22  But, I wanted to make sure that I had a decent background in

23  sampling theory and probably household surveys since they do

24  a lot of household surveys and, indeed, the RECS is a

25  household survey.

68

1    Q    Do you recall anything else that was discussed?

2    A    No.

3    Q    Do you recall the exact words Ms. Harter used in

4  discussing with you what you just mentioned?

5    A    No, but, I would -- no, I really don't remember an

6  awful lot about that particular interview.

7    Q    Did she mention the RECS project?

8    A    It's very likely since that's what she was hiring

9  me to do.

10   Q    And how did you know she was hiring you for the

11 RECS project?

12   A    Well, I didn't at the time.  I don't think I knew

13 I was going to be working on the RECS project until actually

14 after I was hired.  I wasn't sure whether I'd be working on

15 the National Immunization Survey or a survey that where

16 staff had to be moved from, like the RECS, for example, to

17 the National Immunization Survey.

18   Q    During your interview with Ms. Harter did she

19 mention the National Immunization Survey?

20   A    Yes.  We did discuss that just as I did with Kirk

21 Wolter just to be sure that it was a pretty solid project.

22   Q    And what precisely did she say about the National

23 Immunization Survey if you can recall?

24   A    All through the interview when I was talking with

25 Wolter and the vice-presidents I -- I did make -- make it

74

1  side there is no need for any NORC to rush things, closed

2  quote.  Why was it from your side no need for NORC to rush

3  things?

4      A    Well, because by then I had probably made up my

5  mind that I was going to be retiring on the 23rd of February

6  or, what's the date on these, very close to that anyway

7  which was at that time, you know, nearly two months off into

8  the future.

9      Q    Okay.  And then in your deposition you're telling

10 me about the retirement form that you submitted, the form

11 2801.

12     A    Yes.

13     Q    Was that effectively your resignation from the

14 Postal Service as well?

15     A    No.  It was a request for, I believe it's called

16 immediate retirement and then you specify a date, but, I

17 don't think it's a binding document.

18     Q    Did you submit a resignation at any other?

19     A    I believe the day I retired I probably signed

20 something along those lines, but, I'm not sure exactly.  And

21 we may or may not have a copy of whatever that is in that

22 packet of papers that we will copy and send to you.

23     Q    So, through your final day with the Postal Service

24 on February 23, 2005 could you have withdrawn your request

25 for early retirement?

75

1      A      It's possible.  When I signed the -- I do not

2   remember though when I signed the 2801 I was pretty sure

3   that I couldn't withdraw it.  I was thinking of that at the

4   time although I was probably wrong that that was going to

5   finalize things so I put some thought into it.

6      Q      All right.  And did there come a time when NORC

7   extended an offer of employment to you?

8      A      Yes.  Yvonne Johnson called.  It was probably the

9   week before the 10th of January and made me an offer over

10  the telephone and specified a sum because we really hadn't

11  talked about money.

12     Q      Okay.  And what precisely did she say?

13     A      She said I'm extending you an offer of employment

14  to start working with us for a salary of, I believe,

15  $108,000 a year and we will be sending a letter for you to

16  sign and return.

17     Q      Did she say anything else?

18     A      That's about it.  It was a very short telephone

19  call and I had been expecting it since Rachel had already

20  told me it was coming.

21     Q      And what was your response to her?

22     A      Yes.

23     Q      Was it an affirmative yes or a tentative yes?

24     A      No, it was an affirmative yes.  An affirmative

25  yes.

81

1  it.

2       BY MR. BURNS:

3   Q    Mr. Woodruff, let's look at No. 6.

4       MR. HANTZES:  Does he have 7?

5       MR. BURNS:  Yes.

6       MR. HANTZES:  Have you read 7?

7       THE WITNESS:  Yes, I have 7.

8       MR. HANTZES:  Have you read it?

9       THE WITNESS:  Yes.  It says I accepted --

10      MR. HANTZES:  You don't have to read it out loud.

11  I just want to make sure you've read it.

12      BY MR. BURNS:

13  Q    Let's look at No. 6 starting now, Mr. Woodruff.

14  The question that was pending the entire time was whether

15  these documents refresh your recollection or help you pin

16  down the date on which you had that phone call with Ms.

17  Johnson in which she conveyed the offer you mentioned.  Does

18  this help you identify it more precisely the date on which

19  you had that call?

20  A    Either the 5th or the 6th of January and I believe

21  the call came in in the afternoon and is Chicago on the same

22  time or are they an hour --

23  Q    I think an hour behind.

24  A    They're an hour behind, good, okay.  This could

25  have been, this one on the 6th.

92

1                              (Deposition Exhibit No. 8 was

2                              marked for identification)

3                              (Deposition Exhibit No. 9 was

4                              marked for identification)

5          MR. HANTZES:  Are these 8 and 9?

6          MR. BURNS:  8 and 9.

7          BY MR. BURNS:

8      Q    Mr. Woodruff, here before you have been marked as

9   Exhibits No. 8 and 9.  Do you see those?

10     A    Yes, I do.  I have them here.

11     Q    And you can take as much time as you need to to

12  look at any documents so if I start asking you a question

13  and you need some time let me know.  If we look at Exhibit

14  No. 8 is this an e-mail that you received from Ms. Johnson

15  on January 10, 2005?

16     A    Yes, apparently.

17     Q    Okay.  And was an offer letter attached to that e-

18  mail to the extent you can recall?

19     A    I don't remember.  I -- I know I got the offer

20  letter, but, I'm really not sure it came by post, Fed Ex, or

21  something like that or it was attached to the e-mail.

22     Q    Okay.  Well let's take a look.

23     A    The way it's indicated in here that there's -- it

24  says e-mail attached but would there be anything on this e-

25  mail indicating that -- it seems like it should have been an

93

1   attachment, but, I don't remember a writing that way.

2        Q    Well, let's look at Exhibit No. 9.  Do you

3   recognize this document?

4        A    Yes.  This is the letter that clearly was attached

5   to this e-mail or that she said that she was going to send

6   me.  And it has a similar date on it, both dated in January.

7             MR. HANTZES:  Okay.  Let the record reflect that

8   this is DEF-27 and 28.

9             BY MR. BURNS:

10       Q    And if you would turn to the second page of

11  Exhibit No. 9, Mr. Woodruff, there's a signature at the very

12  bottom.  That's what I want to look at.

13       A    Yes.

14       Q    Is that your signature?

15       A    Yes.

16       Q    And there's a date next to it of January 11, 2005.

17  Is that your handwriting?

18       A    Yes.

19       Q    Is that the date on which you signed this letter?

20       A    Yes.

21       Q    Let's look at -- you can look at the first and

22  second page of this.  At the very top, the very, very top

23  there appears to be two fax tag lines.  Do you see those?

24       A    These things?

25       Q    Yes, at the very top in very small print.

95

1   this document has a date of 12:49.

2           MR. BURNS:  That's a time.

3           MR. HANTZES:  That's a time and then it has a

4   14:41.

5           MR. BURNS:  Right.

6           MR. HANTZES:  And, so, --

7           MR. BURNS:  Let me ask this.

8           MR. HANTZES:  Go ahead, do it that way.

9           MR. BURNS:  I'll get to it, Nick.

10          BY MR. BURNS:

11      Q   Mr. Woodruff, do you recall after receiving this

12  letter you signed it, correct?

13      A   Yes.

14      Q   Okay.  And you sent it back to NORC?

15      A   Yes.

16      Q   And do you recall how you sent it back?  Was it by

17  a fax, mail?

18      A   No, I don't really recall how I sent it back.

19      Q   Did you have the ability to send faxes from --

20      A   Yes.

21      Q   -- your Postal Service office?

22      A   Sure, I could have faxed it through the same fax

23  machine that this was sent to.

24      Q   Okay.

25      A   The 7771 number.

1    A    Well, it certainly -- that's probably the only

2    official offer that I got over the telephone.

3    Q    So, that phrase, verbal offer in this Exhibit 9 is

4    referring to Ms. Johnson's official offer?

5    A    Yes.  She -- she -- yeah, that's the way I would

6    read this and then I'm sure the way I read it at the time.

7    Q    Okay.  Now, when you signed the letter on the

8    second page of Exhibit 9 you signed saying that you

9    understood the terms of this offer of employment, is that

10   correct?

11        MR. HANTZES:  Objection.  The document speaks for

12   itself.

13        MR. BURNS:  You can answer.

14        THE WITNESS:  Yes.

15        BY MR. BURNS:

16   Q    Okay.  And if you turn back to the first page, and

17   I apologize for flipping back and forth, but, apparently

18   sometimes if you look at the paragraph at the very bottom,

19   why don't you go ahead and read that out loud for us.

20   Q    While it is anticipated that your employment

21   relations with NORC will be  productive and mutually

22   beneficial, it is important for you to understand that all

23   NORC employees are at will which means that you are -- that

24   you or NORC may for any reason or no reason discontinue the

25   employment relationship at any time.

1    Q    So, when you signed this letter you understood

2 that you would be an at will employee and had no guarantee

3 of continued employment, is that correct?

4    A    Well, it had been represented to me that I would

5 be there for the duration of the contract for the National

6 Immunization Survey and I took that as part of the promise.

7    Q    Okay.  And then let's look at the second page

8 above your signature, the second sentence there, why don't

9 you go ahead and read at that whole two sentence paragraph

10 above your signature.

11    A    I understand and accept the terms of this offer of

12 employment.  I understand that this offer provides no

13 guarantee of continued employment for specific compensation

14 level nor does it constitute an employment contract, either

15 expressed or implied.

16    Q    So, wouldn't you agree then that the language in

17 this letter referring to at will employment and the language

18 in here saying that it provides no guarantee of continued

19 employment is contrary to the representations you made

20 regarding the length of employment you would have at NORC?

21    A    It appears to be, but, it also says that this is

22 not a contract and I interpreted the contract as the verbal

23 representations made to me when I visited NORC as an

24 important condition for my retiring from the Postal Service.

25    Q    Let's look back at page 1.  Look at the second

99

1  paragraph, the first sentence says your salary will be

2  $108,000 annually and earned and paid at the bi-weekly rate

3  of $4,153.85, end quote.  Do you see that?

4      A    Yes.

5      Q    So, did you expect that that would be a term of

6  your employment with NORC that they would pay you $108,000

7  annualized salary?

8      A    Yes, with -- with -- well, according to the --

9  with salary reviews annually as stated in the second

10 sentence.

11     Q    Okay.  And then why don't we look at the next

12 paragraph down which talks about eligibility for paid time

13 off and the last sentence in that paragraph says you will

14 have -- excuse me -- quote, you will accrue PTO at the rate

15 of .10 hours for each hour paid service, the annual

16 equivalent of 26 days per year for a full time employee,

17 closed quote.  Do you see that?

18     A    Yes.

19     Q    So, did you expect that that would be a term of

20 your employment with NORC?

21     A    Yes.  And I imagine that is probably across the

22 board for all their employees, is that not correct?

23     Q    And in the next paragraph it generally says you

24 will be eligible to participate in the NORC's employees

25 benefits package.  Do you see that?

100

1     A    Yes.

2     Q    Did you expect that as part of your employment

3  with NORC the term that you would be eligible to participate

4  in the employee benefits package?

5     A    Yes.

6     Q    So, isn't it a fact then that you knew that you

7  would be an at-will employee with no guarantee of continued

8  employment at NORC based on this letter?

9          MR. HANTZES:  Objection.  Asked and answered.

10          MR. BURNS:  You can answer.

11          THE WITNESS:  Not an at-will employee in that

12  sense.  It would have been linked to the National

13  Immunization Survey contract.  If that had fallen through

14  then that's what I was taking a chance on I suppose.  I

15  didn't expect if anything didn't happen to that that I would

16  be terminated.

17          BY MR. BURNS:

18     Q    Mr. Woodruff, in this Exhibit 9, where in here

19  does it say that you're the employee for the length of the

20  NIS contract?

21     A    That was a representation made to me during my

22  interviews in Chicago.

23     Q    Previously?

24     A    Yes.

25     Q    By whom?

101

1    A    Kirk Wolter and Rachel Harter.

2    Q    But, where does it say in this Exhibit 9 that

3   you'll be employed for the life of the NIS project?

4    A    It doesn't say.

5    Q    And did you make any notation in this letter to

6   suggest that you should be employed for the length of the

7   NIS project?

8    A    No, not here.

9    Q    When you got this letter, before you signed it did

10   you tell anyone that you were supposed to be employed for

11   the length of the NIS project?

12    A    Well, it was one of the conditions of my leaving

13   the Postal Service.

14    Q    My question is, once you got this letter and

15   looked at it and saw it doesn't say anything about being

16   employed for the length of the NIS project no you didn't

17   tell anybody?

18    A    No, I didn't tell anybody at NORC.

19    Q    All right.

20        MR. HANTZES:  After receiving the letter.

21        MR. BURNS:  I've got just a few more questions on

22   this line and then I think it would be a good time to take a

23   short lunch break.

24        MR. HANTZES:  You want to ask questions about this

25   line?

1    Q    Okay.  And then the last sentence there says, can
2  you send me reading material on my new position, surveys,
3  contacts, and so on.  What were you asking for?

4    A    Just for what it states there and I don't know
5  specifically.  The would have to decide, well, we had this
6  survey and this is -- here's the sample design.  Here's the
7  estimator.  Here's how we do variances on it.  Anything --
8  any kind of technical document that would help me get up to
9  speed.

10    Q    Okay.  On whatever project?

11    A    Yes, on whatever project that they want to put me
12  into.

13    Q    And you didn't know what project that you would be
14  working on at this point?

15    A    No, I don't think I did.

16    Q    Okay.  And you're asking to please send reading
17  material on the NIS project, do you?

18    A    No, I didn't.

19    Q    Okay.  Go ahead.

20    A    I believe it was -- it was represented that the
21  reason I was being hired was to work on the NIS project --
22  not to work on the NIS -- frankly, not to necessarily work
23  on the NIS project; I could, but, they added personnel
24  requirements that NORC had imposed on it when they acquired
25  that project.

1    are in some sort of trouble or what was the hot water?

2        A    That was just exactly what I described.

3        Q    And that was what?

4        A    And that's it.  I also had mentioned when we were

5    talking about Kirk Wolter I thought that it might be an

6    opportunity for NORC to work with the Postal Service later

7    on and help him with -- all their surveys have the same

8    problem.  They've used standard sampling theory and applied

9    it to completely uncontrolled designs and they have bad

10   estimates as a result.

11       Q    Were you ever reprimanded or disciplined in any

12   way at the Postal Service for this?

13       A    No.  No.  Never.  This was -- this was strictly we

14   don't want you going to meetings, Joint Statistical

15   Meetings, ASA meetings, and presenting this material which

16   is very interesting material by the way, and we're canceling

17   the redesign on the outbound survey.

18            They weren't going to change anything on the

19   inbound survey.  But, the outbound survey is now being

20   redesigned by someone else, but, following the procedures I

21   used for the inbound survey and so that's what that was

22   referring to.

23       Q    So, backing up to your retirement, the form 2801

24   that you submitted, that you submitted on January 13, 2005

25   that you signed on January 12, 2005.  Had you not submitted

1   that form you could have chosen to stay with and employed at

2   the Postal Service, is that correct?

3       A    Certainly.  As I just said, I was offered a small

4   salary increase to stay.

5       Q    And how much of a salary increase?

6       A    I don't know.  Ross Bailey made the offer at the

7   going away luncheon.  He said, well, I offered Steve

8   additional money to stay and I didn't request it and I

9   didn't look into what the additional amount would be.  It

10  would have been a few thousand dollars perhaps.

11                  (Discussion off the record)

12      (Whereupon, a luncheon recess was taken at 12:51 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

113

1    actually three months after my interview in August.    I

2    believe it must have been November when she called me and

3    said, well, we've got the NIS and we need you now.

4        Q    And you were terminated from NORC, is that

5    correct?

6        A    Yes.  Yes, and that was interesting too because

7    the reason I was terminated was because the NIS was lost

8    apparently.  I found out later that that wasn't true.  I

9    think I talked to somebody actually in Atlanta several

10   months after I was terminated who -- and I wish I could

11   remember his name. I probably have it somewhere -- who

12   monitors that survey, a government employee, and he was

13   unaware of any change in the NIS and I started getting

14   particularly concerned.

15       Q    What date were you terminated if you can recall?

16       A    I think it was the 16th of June.

17       Q    2005?

18       A    Yes.

19       Q    And how did you learn you were being terminated?

20       A    Pardon me?

21       Q    How did you learn you were being terminated?

22       A    Oh, that's an interesting one too because two

23   weeks or perhaps less than that before I was terminated

24   Rachel called me and said that I was going to be officially

25   supervising the staff that I had been working with and

126

1    complaint where I was hired.  It was certainly my hiring was

2    represented to me as to fulfill staffing requirements

3    generated by winning the NORC contract.  That was the game

4    plan from the very beginning.

5        Q    What did you believe would be the length of your

6    employment with NORC?

7        A    The duration of the contract and if things worked

8    out, longer than that.

9        Q    When you say the contract --

10       A    The National Immunization Survey contract.

11       Q    And how long did you expect the NIS contract to

12   last?

13       A    About five years.

14       Q    And the NIS contract was a contract that NORC had

15   with whom?

16       A    The CDC and the various drug immunizations, the

17   various branches of it, NCHS and, well, alphabet soup.  Let

18   me just say it's the CDC.

19       Q    The CDC being the Center for Disease Control?

20       A    Disease Control, yeah.

21       Q    It's a government --

22       A    It's headquartered in Atlanta.  NIH may well have

23   been involved in it too.

24       Q    CDC's a federal government entity?

25       A    Yes, it is.

131

 1 | other than what you told me about earlier today?

 2 |           MR. HANTZES:  Wait a minute.

 3 |           MR. BURNS:  Go ahead.  That's fine.

 4 |           BY MR. BURNS:

 5 |      Q    Very specifically, what did they say?

 6 |           MR. HANTZES:  Asked and answered.

 7 |           THE WITNESS:  I don't remember specifically what

 8 | Rachel said except that that was the reason I was being

 9 | hired and I remember going into the issues particularly with

10 | Kirk but exactly what he said this is as good a description

11 | of it as you have here except that it probably shouldn't say

12 | five years as if the term is exact or something in that

13 | neighborhood if it was not canceled.

14 |      Q    All right.  Then let's look at 16-3.  Who at NORC

15 | made those statements or that statement?

16 |           MR. HANTZES:  Mr. Woodruff being employed during

17 | the term of the project, is that what you're thinking?

18 |           MR. BURNS:  16-3, correct, yes.  Paragraph 16-3.

19 |           THE WITNESS:  Rachel.

20 |           BY MR. BURNS:

21 |      Q    Anybody else?  Again, before you were hired.

22 |      A    No.

23 |      Q    Which of these three statements, paragraph 16-A,

24 | 16-2, and 16-3 do you think were false, if any?

25 |      A    That Mr. Woodruff would be employed during the

1  term of the contract or term of the project.  Clearly, it

2  wasn't.  It didn't work out that way.  I was working there

3  for three and a half months.  And in spite of the fact they

4  represented to me the NIS was terminated, it wasn't, but, I

5  was.

6      Q    At the time -- well, let's look then at paragraph

7  16-3, that statement that you attribute to Rachel Harter.

8  When did she make that statement to you?

9           MR. HANTZES:  Asked and answered.

10           THE WITNESS:  I'm really not sure whether it was

11  in November or December.

12           BY MR. BURNS:

13      Q    And at the time that she made that do you think

14  she knew that it was a false statement?

15      A    I don't know.

16      Q    So, it's possible she didn't know it was an

17  incorrect statement?

18      A    Yes.  I mean, I really can't know what she was

19  thinking.

20      Q    At the time these statements in paragraph 16 were

21  made do you think that either Rachel Harter or Kirk Wolter

22  intended to deceive you?

23      A    And, once again, I'll answer the same way. I

24  really don't know what the motivation was for this, whether

25  it was just something like, what's the right word,

133

1  negligence or -- or intent.

2       Q    Do you think they intended to deceive you though?

3       A    I don't know.

4       Q    So, you don't know whether they intended to

5  deceive you?

6       A    No, I don't.  It's certainly in light of other

7  things I guess it's possible.

8       Q    It's possible and it's also possible they did not

9  intend to deceive you?  Is that correct?

10      A    Yes, yes, yes.

11      Q    And you said it's possible in light of other

12 things.  What other things?

13      A    Well, it was really a peculiar process of

14 termination, wasn't it, to be implicitly promoted when the

15 person promoting you knows they're going to fire you within

16 the next two weeks.

17      Q    Who told you you were promoted?

18      A    Rachel Harter again.

19      Q    What exactly did she say?

20      A    She said, well, you're now the supervisor for the

21 statisticians working on RECS and that was around the first

22 of June, somewhere in that first week of June.

23      Q    Was this an in-person meeting or on the phone?

24      A    We had almost no in-person meeting since

25 everyone's in Chicago.  The only time she was down here

147

1   exactly how it's manifested, primarily insecurity about the

2   future, I guess, and -- and it doesn't -- well, anyway, it

3   doesn't help marital relations at all.

4           MR. BURNS:  Do you want to take a minute?

5           THE WITNESS:  No, I'm fine.

6           BY MR. BURNS:

7       Q    Anything else on the emotional distress?

8       A    No, that's --

9       Q    Looking at the same paragraphs of 25, 33, and 48

10  and this also, now 49, this mentions lost income?

11      A    49.  I don't think I have a 49.  It goes up to 48.

12      Q    39.

13      A    Oh, okay.

14      Q    At the end of each of the counts in each of the

15  paragraphs we just looked at on emotional distress it

16  mentions lost income as well as also in 39 here.  Do you

17  want to take a second at the same things we just looked at.

18  What income have you lost?

19      A    Well, I'm counting the income that I would have

20  earned if I had stayed with NORC for an additional five

21  years and that's where I came up with the estimates. It's

22  normal pay increase over that period of time that's expected

23  in most jobs and benefits, probably another -- I'm not sure

24  exactly but it's an approximate figure.  What did we come up

25  with on that, six hundred in lost income?

148

1          MR. HANTZES:  But, the income, what are you

2   looking for?

3          THE WITNESS:  Oh, you're asking me --

4          MR. HANTZES:  As to lost income right now.  I

5   mean, can he refer to the interrogatories?

6          MR. BURNS:  Yeah.

7          MR. HANTZES:  I know why he would.  See, I think

8   you're thinking of --

9          THE WITNESS:  I'm looking in the wrong place.

10          MR. HANTZES:  No, you're not.  He's directing you

11   that.  He's permitted you to look at your interrogatory

12   answers, in fact, to expedite the answers.

13          Let the record reflect the witness has in front of

14   him Exhibit 11 and has turned to interrogatory number 3

15   which asks about that.

16          BY MR. BURNS:

17   Q    Let me just ask you a question just on the income

18   you would have had had you stayed with NORC for five years.

19   A    Yes.

20   Q    Did you really have an expectation though of

21   employment for five years?

22   A    Approximately.  It could be more, it could be

23   less.  But, that was my time horizon at the point.

24   Q    So your contract of employment was you were

25   expecting somewhere in the area of five years?

149

1     A    Yeah, based on the National Immunization Survey

2  and its duration and that's a little bit fuzzy but somewhere

3  in that general area.

4     Q    When we look at Exhibit 11, interrogatory number

5  3, that's page 4 --

6     A    Uh-hmm, got it.

7     Q    -- the second sentence says plaintiff seeks

8  $600,000 in compensatory damages.  What are we talking when

9  we say compensatory damages, we're talking about the lost

10  pay and benefits?  Is that what you're referring to?

11     A    That was my understanding and that's how we came

12  up with that figure, I believe.  I worked with Nick on that.

13           MR. HANTZES:  Counsel, I think the explanation for

14  the six hundred --

15           MR. BURNS:  It's not clear to me which is why I'm

16  asking.  If you want to clarify I don't have a problem if

17  you want me to ask him a certain question.

18           MR. HANTZES:  But, I think the initial estimate is

19  $108,000 times five plus sixty.

20           MR. BURNS:  Okay.

21           MR. HANTZES:  Well, Steve, how do you get to six

22  hundred?  The $108,000 times five is $540,000.

23           THE WITNESS:  Okay.  Then we're talking about --

24           MR. HANTZES:  Then how do you get to six hundred?

25           THE WITNESS:  If it stayed at $108,000 permanently

1          MR. HANTZES:  Except that we're going to produce

2    the other documents.

3          THE WITNESS:  Yes, the retirement papers.

4          BY MR. BURNS:

5      Q    Are there any other facts that we haven't

6    discussed during your deposition which you believe support

7    your claims?

8      A    I think this pretty well covers it.

9          MR. BURNS:  All right.  I think I'm done, Nick.

10   Do you have any questions?

11         MR. HANTZES:  Yes, I do.

12         MR. BURNS:  I'd just like to say we might have to

13   reconvene for a short deposition once those retirement

14   documents are produced, but, we'll figure it out then.

15         MR. HANTZES:  No objection.

16         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

17         BY MR. HANTZES:

18     Q    Okay.  What did Rachel Harter say to you in

19   November about NIS during the interview?

20         MR. BURNS:  Objection.  Asked and answered.

21         THE WITNESS:  The details I don't remember but she

22   did tell me that the reason that they were hiring me was to

23   staff up for the National Immunization Survey, not that I

24   would be working on it directly.  I would be working on it -

25   - I would be working on other projects that would need

180

1    statisticians because the people currently working on those

2    projects were now going to be working on the National

3    Immunization Survey.

4           BY MR. HANTZES:

5    Q    Okay.  Did anyone tell you that you would not work

6    on the NIS survey during the course of the NIS contract?

7    A    No, no, I think that was always a possibility.

8    Q    Now, the defendant's interrogatory answer to

9    number 5 has a statement.  Do you have your --

10          MR. BURNS:  I don't have a copy of it.

11          MR. HANTZES:  I can just read the statement into

12   the record and then I'm going to ask you if you think this

13   is the correct statement.

14          MR. BURNS:  Let me look it over first.

15          MR. HANTZES:  Yeah, that's fine.

16          MR. BURNS:  Let me make a photocopy real quick.

17          MR. HANTZES:  Let me show you.  This is

18   interrogatory number 5.  Let me show you what this is.  This

19   is --  I'm going to read you a statement and tell me if it's

20   true.  That's what I'm going to do.

21          MR. BURNS:  Tell you what, Nick, let me make a

22   photocopy real quick.

23          MR. HANTZES:  I think we can do it.

24          MR. BURNS:  Go ahead.

25

212

1   question.

2           THE WITNESS:  Well, the original estimate by the

3   folks at NORC was about five years.

4           BY MR. BURNS:

5       Q    I'm asking what your expectation was as to --

6       A    Mine is what they stated.

7       Q    So you expected the NIS project to last for five

8   years?

9       A    Approximately.

10      Q    Earlier on a question by your counsel you said

11  something about I guess an annuity being $75,000 more per

12  year?

13      A    Not the annuity.  I'm just comparing it to the

14  savings loss.  It's equivalent to a savings loss of that

15  amount since the $5,000 -- in other words, if I didn't get

16  the annuity how much more would I have to make up for not

17  getting the annuity and it would be an additional $75,000 a

18  year in income in the bank conservatively invested earning

19  something approximate netting dividends or stock

20  appreciation or interest rates that I could earn on it now

21  and it would generate roughly that $5,000 figure.

22      Q    Generate that roughly $5,000 annuity?

23      A    Annually.

24      Q    Based on what life expectancy?

25      A    On that, as far as I'm concerned the life

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Sharon Lee Mitrothanasis, the officer before whom

the foregoing deposition was taken, do hereby certify that

the witness whose testimony appears in the foregoing

deposition was duly sworn by me, that the testimony of said

witness was taken by me electronically and thereafter

reduced to typewriting by me or under my supervision; that

said deposition is a true record of the testimony given by

said witness, that I am neither counsel for, related to, nor

employed by any of the parties to the action in which this

deposition was taken; and, further, that I am not a relative

or employee of any attorney or counsel employed by the

parties hereto, nor financially or otherwise interested in

the outcome of the action.


_____
NOTARY PUBLIC OF THE
District of Columbia


My Commission Expires:
June 30, 2010