UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN WOODRUFF )<br>)<br>      Plaintiff      )<br>)<br>      v.      )<br>)<br>NATIONAL OPINION RESEARCH )<br>CENTER      )<br>)<br>      Defendant      )<br>_____) | Case No. 1:06-CV-00832(RJL) |

**PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS**

Plaintiff, Stephen Woodruff, (Woodruff, or Plaintiff) pursuant to Rules 7(h) and 56.1 of the Local Rules of the United States district Court for the District of Columbia, hereby submits this Statement of Disputed Material Facts.

**Basis for Woodruff's Claims**

1. Plaintiff Stephen Woodruff asserts that he believed he was to be employed for the length of NORC's National Immunization Survey contract. Pl. Dep. at 126; Complaint.

DISPUTED. Plaintiff Woodruff was told by NORC officials Harter and Wolter that he would be employed the length of the NIS contract. Pl. Dep. at 58, 60, 61, 68, 112-113, 130, 138.

2. Woodruff expected the National Immunization Survey contract to last for approximately five years. Pl. Dep. at 212.

DISPUTED. Plaintiff Woodruff was told by NORC Senior Fellow, Wolter that the NIS project would last approximately five years. Pl. Dep. at 61, 112-113, 130, 138.

1

**Woodruff Applies For Employment With NORC;  The Employment Application States That Employment Is At-Will**

3.      In August of 2004, Woodruff, then a Mathematical Statistician for the United States Postal Service ("USPS"), attended the Joint Statistical Meetings of the American Statistical Association ("JSM") in Toronto, Canada, where he spoke with several organizations about working for them.  Pl Dep. at 32, 36-37; Exh. 4.

UNDISPUTED.

4.      At JSM, Woodruff submitted his resume to NORC and met with Rachel Harter, a Vice President of NORC in charge of the Statistics and Methodology Department.  Pl. Dep. at 36, 39-40; Exh. 2 at 6 (Harter Dep.).

UNDISPUTED.

5.      On August 13, 2004, Woodruff completed a NORC employment application. Exh. 4; Pl. Dep. at 40-41.

UNDISPUTED.

6.      Woodruff signed the application acknowledging the following statement:

> "I understand that employment is 'at-will' and either party may terminate the employment at any time."
> Exh. 4 at 4; Pl. Dep. at 40-41.

DISPUTED.  This fact is not material because the parties subsequently entered into an enforceable oral contract .  Pl. Dep. Exhibit #7.  Additionally, this statement in isolation cannot constitute the terms of an employment contract.

**Woodruff Interviews At NORC's Offices**

7.      On or about November 1, 2004, the Centers for Disease Control awarded the National Immunization Survey project ("NIS") contract to NORC.  Pl. Dep. at 126 Exh. 3 at 64, 68 (Thompson Dep.).

UNDISPUTED.

8.      After NORC won the NIS contract, many of Harter's staff "were being absorbed into the NIS project, and [she] didn't have people to support the other projects."  Exh. 2 at 17-18, 64.

2

UNDISPUTED.

9.    NORC "went back to candidates[it] had interviewed at JSM to see [with whom it] wanted to follow up" Exh. 2 at 54.

UNDISPUTED.

10.   In or about November 2004, Harter called Woodruff and invited him to interview at NORC's offices for possible employment as a statistician. Pl. Dep. at 44, 49-50; Exh. 2 at 14.

UNDISPUTED.

11.   Woodruff interviewed with various NORC personnel on December 10, 2004, including Harter and Kirk Wolter, a Senior Fellow at NORC. Pl. Dep. at 50, 59, 67; Exh. 3 at 26.

UNDISPUTED.

12.   On January 5 or 6, 2005, Yvonne Johnson, at NORC Human Resoures representative, called Woodruff. Pl. Dep. at 52, 81.

UNDISPUTED.

13.   Johnson told Woodruff that NORC was extending him an offer of employment with a salary of $108,000 per year, and that NORC would be sending him a letter to sign and return. Pl. Dep. at 75.

DISPUTED. The paragraph fails to set forth the following material facts which occurred prior to the call. Plaintiff Woodruff is a highly respected and published mathematical statistician. Pl. Complaint at 1. Plaintiff was employed at the United States Postal Service (USPS) in late 2004, where he had been employed for over seven years. *Id.* Plaintiff was in good standing and had no compelling reason to leave his job. *Id.* In fact, upon learning of Plaintiff's plans to leave, the USPS offered Plaintiff a small salary increase to stay. Pl Dep. at 109. In August of 2004, plaintiff interviewed with NORC, along with two other companies, at the Joint Statistical Meeting in Toronto, Canada. *Id.* at 37-39. In November of that year, Plaintiff was called by Rachel Harter, Vice President

3

of the Statistics and Methodology Department for Defendant, NORC for interviews for a position in her department. *Id.* at 49-51. Plaintiff went to Chicago for interviews with Defendant where he interviewed with Kirk Wolter, Senior Fellow at NORC and Ms. Harter, among others. *Id.* Pl. Dep. Exhibit #3.

 Plaintiff inquired of both Mr. Wolter and Ms. Harter the reasons why NORC needed to hire and was told that NORC needed additional staff to meet staffing requirements imposed by their recent acquisition of the NIS project. Pl. Dep. at 58-60. During his interviews, Plaintiff made it abundantly clear that his retirement from the government and move to NORC was contingent on NORC having sufficient work for him. *Id.* at 69, 138. Hence, Plaintiff inquired specifically of Wolter and Harter about the expected duration of the NIS project and the duration of NORC's need for his services to fulfill the additional staffing requirements. Pl. Dep. at 58-60, 68. The sufficiency of the work was predicated on the NIS project and how long it lasted. *Id.* He was told that the NIS project was a solid project of five years duration and he could depend on the need for his services as part of the additional staffing services for the duration of the project. *Id.* at 61,112-113,130. Plaintiff made it clear that he was leaving his government job at the USPS based on their representation that he would be employed during the duration of the NIS project which was anticipated to be five years. *Id.* at 138.

Plaintiff returned to Washington, D.C. after the interviews and NORC corresponded with Plaintiff via phone and e-mail. Plaintiff had several phone calls from Ms. Harter discussing terms and keeping him apprised of the hiring process. Ms. Harter indicated that NORC would like to hire Plaintiff. *Id*. at 69-70. On January 5, 2005, HR representative, Yvonne Johnson called Plaintiff to further Ms. Harter's verbal offer of

4

employment and relayed the salary amount of $108,000 and Plaintiff tentatively accepted this verbal offer. Pl. Dep. Exhibit # 6.  During the morning of January 6, 2005, Plaintiff sent an e-mail with a couple of questions relating to the salary and benefits. *Id.*  By the evening of January 6, 2005, Ms. Johnson was happy to announce to Ms Harter that Plaintiff had accepted the verbal offer and that she had already confirmed a start date of February 28th, 2005  Pl. Dep. Exhibit # 7.  Upon acceptance of the verbal offer, Mr. Woodruff accepted the oral contract of employment consisting of an annual salary of $108,000 as stated by Ms. Johnson in her phone call to Mr. Woodruff and the duration of employment measured by the term of NORC's contract to work on the NIS project.  Pl. Dep. at 183, 185.

Subsequent to Plaintiff's verbal acceptance and confirmation of his oral contract, Ms. Johnson sent an e-mail with an offer letter on January 10, 2005, Pl. Dep. Exhibit 9. The letter contained the clear and unequivocal statement that the offer letter did not constitute an employment contract expressed or implied.  *Id.*  Seeing that language, Plaintiff correctly determined that the letter did not change the terms of the oral contract he entered into on January 6, 2006 upon relaying acceptance of the offer to Ms. Johnson in a phone call.  Since, it was clear that the offer letter did not purport to be an employment contract, Plaintiff properly relied upon, as the contract terms, the representations of the two high level officials Mr. Wolter and Ms. Harter, assuring him employment for the duration of the NIS project, along with the phone call from Ms. Johnson stating the salary and describing fringe benefits as the employment agreement.  *Id.* at 142-143.  At no time during the negotiation of the oral employment agreement or prior to Plaintiff's acceptance of Defendant's offer did any employee of NORC indicate that Plaintiff's

5

employment was "at will" such that he could be terminated at any time for any reason. *Id.* at 182, 188-189. On the contrary, Defendant specifically represented to Plaintiff his employment would be for the term of the NIS project. Accordingly, Plaintiff correctly interpreted the reference in this letter to employment-at-will to be tied to the NIS contract, as previously discussed with officials Harter and Wolter. *Id.* at 98-100.

14. On January 10, or 11, 2005, NORC sent to Woodruff a written employment offer letter dated January 10, 2005 ("Offer Letter"). Pl. Dep. at 92-93; Exh. 5

DISPUTED. The fact is immaterial. The parties had already entered into an oral contract prior to receipt of the January 10th letter and therefore it can not be an "offer." See Plaintiff's response to paragraph 13.

15. The Offer Letter offered Woodruff a position as a Senior statistician II, and, as Woodruff has admitted, contained various terms that, were he to accept, he expected would be part of his employment with NORC (e.g. salary, paid time off, benefits). Exh. 5; Pl. Dep. at 98-100.

DISPUTED. The offer letter states on its face that it is not a contract. The parties had already entered into a contract, since Plaintiff had accepted the oral offer and confirmed his start date. This letter explains benefits conveyed in the prior phone call. *See* Plaintiff response to paragraph 13 above; Pl. Dep. Exhibit #9.

16. The Offer Letter, without condition, informed Woodruff:

> While it is anticipated that your employment with NORC will be productive and mutually beneficial, it is important for you to understand that all NORC employees are 'at-will', which means that you or NORC may, for any reason or no reason, discontinue the employment relationship at any time. Exh. 5.

DISPUTED. This letter is not a contract of employment and cannot be considered binding. Pl. Exhibit #9. There was already a binding oral contract. *See* Plaintiff response to paragraph 13 above. Furthermore, the letter is immaterial because it did not insulate Defendant from its employees prior fraudulent statements. *See* pages 11-15 of

6

Memorandum of Points And Authorities In Support of the Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

17.     The Offer Letter instructed Woodruff to "call [NORC's Director of Human resources] directly if you have any question about our offer." Exh. 5.

DISPUTED.  The fact is immaterial.  Plaintiff had no questions regarding this letter, because it stated that it was not a contract, so he relied on the previous representations establishing the oral contract and did not question the contents of this letter, as it merely explained benefits.  Pl. Exhibit #9, Pl. Dep. 186-188.  The questions he had regarding salary and benefits, had already been asked of Ms. Johnson.  Pl. Dep. Exhibit #6.  *See* Plaintiff response to paragraph 13 above;

18.     The Offer Letter further stated:  "To formally accept this offer of employment, please sign below and return it to" the Director of Human Resources.  Exh. 5.

DISPUTED.  The fact is immaterial.   Plaintiff had already accepted the offer of employment verbally and committed to a start date and the letter stated it was not a contract and therefore his signature did not nor could be interpreted to  create an employment contract.  Pl. Dep. Exhibit #7.

19.     Woodruff admits that the Offer Letter does not say that he would be employed for the length of the NIS contract.  Woodruff also admits that he did not make any notation on the letter to suggest that he should be employed for the length of the NIS contract.  Pl. Dep. at 101.

DISPUTED.  This fact is immaterial, as the contract was formed prior to the date of the letter.  Any terms written on this letter would have been immaterial, as the oral contract was already offered, accepted, and binding on the parties.  Pl. Dep. Exhibit #7; *See* Plaintiff response to paragraph 13 above;

20. Once Woodruff received the Offer Letter and read it, he did not tell anyone that he thought he was supposed to be employed for the length of the NIS contract. Pl. Dep. at 97, 101.

DISPUTED. This fact is immaterial, since the parties had already entered into a binding agreement. Pl. Dep. Exhibit #7; *See* Plaintiff response to paragraph 13 above;

21. On January 11, 2006, Woodruff signed the Offer Letter stating: "I understand and accept the terms of this offer of employment. I understand that this offer provides no guarantee of continued employment…" Exh. 5; Pl.Dep. at 93.

DISPUTED. The language Defendant cites is immaterial. The material language is the language Defendant leaves out, which is the language that states that the letter is not a contract expressed or implied. Pl. Dep. Exh. 9.

22. Woodruff then returned the signed Offer Letter to NORC. Pl. Dep. at 95.

DISPUTED. This fact is immaterial because the letter did not create a contract and the oral contract is binding here. *See* Plaintiff response to paragraph 13 above; Furthermore, the letter is immaterial because it did not insulated Defendant from its employees prior fraudulent statements. *See* pages 11-15 of Memorandum of Points And Authorities In Support of the Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

**After Signing The Offer Letter, Woodruff Submits His Request For Retirement to the USPS**

23. On January 12, 2005, the day after signing the Offer Letter, Woodruff completed and signed his application for immediate retirement from the USPS. PL. Dep. 21; Exh. 6.

UNDISPUTED.

24. Woodruff submitted the retirement form to USPS human resources on January 12 or 13, 2005, and it bears a USPS human resources date stamp of January 13, 2005. Pl. Dep. at 21,23; Exh. 6.

UNDISPUTED.

25. After receiving the Offer Letter, Woodruff could have chosen to stay employed with USPS and not submitted the retirement form. Pl. Dep. at 108-109.

UNDISPUTED.

26. Even after having submitted the retirement form, Woodruff could have withdrawn his request for retirement. Pl. Dep. at 74-75.

DISPUTED. The statement mischaracterizes the testimony. Plaintiff states that he could

have stayed at the USPS if he had not submitted the form 2801 resignation letter. Pl.

Dep. at 74-75. He did not testify he could have withdrawn his resignation.

**Woodruff's Employment with NORC and Termination**

27. Woodruff retired from the USPS effective February 23, 2005 and began working for NORC on February 28, 2005. Pl. Dep. at 15, 55.

UNDISPUTED.

28. Woodruff was terminated from NORC on June 16, 2005. Pl. Dep. at 113.

UNDISPUTED.

        Respectfully submitted,

        STEPHEN WOODRUFF

        By:  /s/ Nicholas H. Hantzes

        Nicholas H. Hantzes, Esq.
        #361450
        HANTZES & REITER
        1608 Spring Hill Road
        Suite 420
        Vienna, VA 22182
        703 378 5000
        571 633 0203 (fax)
        Counsel for Plaintiff