IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - -X
STEPHEN WOODRUFF,                :

          Plaintiff,             :

     v.                          : Case No.: 1:06-CV-00832(RLJ)

NATIONAL OPINION RESEARCH        :
CENTER,
                                 :

          Defendant.             :
- - - - - - - - - - - - - - - -X
```

                              Tuesday, November 28, 2006

                              Washington, D.C.

Deposition of

                    STEPHEN WOODRUFF

plaintiff, called for examination by counsel for the

defendant, pursuant to notice, at the offices of David Burns,

Esquire, 815 Connecticut Avenue, N.W., Suite 500, Washington,

D.C. 20006, beginning at 10:00 a.m., before Sharon

Mitrothanasis a notary public in and for the State of

Maryland, when were present on behalf of the respective

parties:

37

1   2002.  I think maybe John Thompson had contacted Partha

2   Lahiri for people or vice-versa.  But, I don't think one was

3   involved in 2002.  And, later in 2004, I'm not sure how much

4   he was involved either since the main contact was with

5   Rachel Harter at the Joint Statistical Meetings.

6       Q    So, in 2002 were you looking to leave the Postal

7   Service?

8       A    I was considering it because I was eligible to

9   retire in 2002 and I could go around and look for other

10  options and I was exploring them.

11      Q    Did you apply to any other places other than NORC

12  in 2002?

13      A    Yes.  Oh, not in 2002.  Just NORC.

14      Q    What about in 2003?

15      A    No.  Not until 2004.  The same time I talked to

16  Rachel I talked to several other similar organizations that

17  do survey work.

18      Q    And this was at the Joint Statistical --

19      A    Yes, at the Joint Statistical Meetings.

20      Q    And did you interview with any other?

21      A    Yes.  I interviewed with Battelle and with

22  Research Triangle Institute.

23      Q    I'm sorry, what was the first one, Battelle?

24      A    Yes.  B-A-T-T-E-L-L-E, I believe.

25      Q    Is that an entity, a research entity of some sort?

38

1      A    Yes, it's a non-profit like NORC.  They get lots

2   of government contracts and they do a lot of things besides

3   statistics.

4      Q    And the other place you mentioned, Research?

5      A    Triangle Institute.  But, its name has been

6   changed to RTI International, I believe too, and the RTI

7   doesn't necessarily mean Research Triangle, but, I'm not

8   really certain about those pieces of nomenclatures though.

9   I don't depend on them.

10      Q    With Battelle, was that a screening interview at

11   the JSM?

12      A    Yes, and then in both cases I went through an

13   initial interview at the JSM and then some weeks or months

14   later went to their offices, one in Cincinnati and the other

15   one down in North Carolina.

16      Q    Did you receive any job offers?

17      A    No, I didn't.

18      Q    When did you visit the offices of Battelle?

19      A    September or October, I would guess, in 2004 and

20   September and October also for Research Triangle.

21      Q    Other than Battelle and Research Triangle and NORC

22   did you interview with any other entity or person in 2004?

23      A    Not that I recall.

24      Q    And the JSM in 2004, you said that was in Toronto,

25   correct?

39

1    A    I think so, but, there were some meetings every

2  summer and in cities all over North America so they tend to

3  get blurred after a while.  I know I've been to Toronto a

4  couple of times.  I vaguely remember it was in Toronto.

5  This year it was different.  They went to Seattle and that

6  was a whole new thing going out to that particular city.  I

7  don't think they've ever been there.

8    Q    And the 2004 one, do you remember what month that

9  was held?

10    A    They're all in August every year.  That's one

11  thing they all have in common, not the location.

12    Q    And did you submit your resume to NORC at the JSM

13  in August 2004?

14    A    Yes.                .

15                              (Deposition Exhibit No. 1 was

16                              marked for identification)

17          BY MR. BURNS:

18    Q    Mr. Woodruff, you have before you what's been

19  marked as Woodruff Exhibit No. 1.  Do you see that document?

20    A    Yes.

21    Q    And do you recognize this document?

22    A    Uh-hmm.

23    Q    And what is it?

24    A    This is my resume.

25    Q    And is this the resume you submitted to NORC at

1    A    When I wrote this, yeah, that date was a little

2    premature, but, I signed this in August and I hadn't

3    computed out exactly when I wanted to schedule that

4    retirement date so I put down January of 2005 but it turned

5    out to be February of 2005.

6    Q    Okay.  And why weren't you available sooner than

7    January 2005?

8    A    Well, in theory, I was available in September of

9    2004, but, I didn't want to and I hadn't made any decisions

10   then and, so, these dates are approximate based on my

11   feelings, the dates I sign this way back in August.

12   Q    Okay.  So what happened after the JSM in August of

13   04?  I think you mentioned earlier that you got called in

14   for an interview or something.  Why don't you tell me what

15   happened with NORC after the JSM in August of 04?

16   A    In November, I believe, I was called by Rachel and

17   I don't now that I had any contact from her between the

18   interview in August and the time I filled this out and when

19   she called me in November.  I don't recall any contact, but,

20   there might have been and finally in November she called and

21   said that she was interested in considering me.

22   Q    And what else did she say?

23   A    Well, come on down and talk to us or come on up to

24   Chicago and talk to us. So she organized a -- I flew in in

25   the morning and out in the afternoon and I don't think I

1  stayed overnight there.  I'm pretty sure I didn't.  So, I

2  organized the usual like the one I had three years

3  previously or two years previously.  Flied up to Chicago and

4  had an interview schedule starting around nine or ten in the

5  morning and going through until around three in the

6  afternoon.  I flew out.

7      Q    And did she say anything else on that phone call?

8      A    Not that I recall.

9      Q    And what did you say?

10     A    Yes, I'll come.

11     Q    And did you eventually go to Chicago to interview

12  with NORC personnel?

13     A    Yes.  Apparently, if the documents that I read are

14  correct, on the 10th of December.  Until I read those in the

15  last week or so I didn't know the date exactly.  I just know

16  it was December.

17     Q    And between the time that you received that call

18  from Rachel in about November of 2004 and the date that you

19  were in Chicago interviewing did you have any other

20  communications with Rachel?

21     A    I don't remember.  These interviews also could

22  have been set up by someone in personnel who might have been

23  in charge or someone other than the vice-president who might

24  have been in charge of making the arrangements, the flight,

25  the tickets and it probably was in fact and that is the

1  person I could have been in contact with, but, she was doing

2  or he, whoever it was on the direction of Rachel Harter.

3       Q    Do you have any recollection of any communications

4  with such other people prior to being in Chicago to

5  interview?

6       A    No.

7                           (Deposition Exhibit No. 3 was

8                            marked for identification)

9            BY MR. BURNS:

10      Q    Mr. Woodruff, you have before you what's been

11 marked as Exhibit No. 3.  Do you see that document?

12      A    Yes.

13      Q    And is this the document that you were referrring

14 to that you saw prior to your deposition?

15      A    No.  I haven't seen this probably since the time I

16 interviewed.

17           MR. HANTZES:  Counsel, when he says document you

18 want to ask him what he means by document?  I think he

19 includes a deposition as a document.

20           THE WITNESS:  Yes, that's right.  I'm including

21 the deposition as a document because that's almost certainly

22 where I saw the date in December.

23           BY MR. BURNS:

24      Q    All right.  Do you recognize this document that's

25 been marked as Exhibit 3?

58

1        A    He probably did, but, I don't remember exactly.

2        Q    Okay.  And did you subsequently learn what

3   projects he worked on?

4        A    Well, he was one of the people that I was working

5   with on RECS.  He was probably assigned to several other

6   surveys besides it because imputation is something they need

7   in most of their surveys.

8        Q    And when you look back at Exhibit 3, the last name

9   there is Hiro Minatu?  Am I mispronouncing it?

10       A    Uh-hmm.

11       Q    Who is Hiro Minatu?

12       A    I don't remember a thing about that interview

13  frankly and it might have been that he couldn't make it or I

14  know there were some last minute changes in these things.  I

15  vaguely recall that Yvonne Johnson was in the hospital.  I

16  could be wrong about that and I can't remember anything

17  after -- I don't really remember if I interviewed with the

18  last person.  It's not certainly not somebody I ever came to

19  work with.  It's certainly not somebody that I never worked

20  with when I came to work there.  He was never assigned to

21  any of the projects I was working on.

22       Q    All right.  Well, then let's go back to the name

23  Kirk Wolter on the list.

24       A    Uh-hmm.

25       Q    And who is Kirk Wolter?

 1      A     He is one of their vice-presidents and he used to

 2    work at the Census Bureau.    He's written fairly standard

 3    text on variance estimation that they use at NORC and a lot

 4    of other places.    It's one of the classics I think in that

 5    it was one of the first books that covered all the various

 6    techniques for air variance estimation from survey data.  He

 7    wrote it while he was at the Census Bureau and you'll

 8    probably find it in a lot of offices unless it's been

 9    superseded in the last ten years, but, I believe it was

10    published in the 80's and it was the only book of its kind

11    for a fair number of years after that, say ten years or so,

12    and could still be the only one like it.

13      Q     Did you have any interaction with him when he was

14    at the Census Bureau?

15      A     No.    He mentioned that I worked at the Census

16    Bureau in his deposition but I never worked at the Census

17    Bureau.    And my only interaction with him was that I studied

18    under him when I was doing sampling theories for one year at

19    George Washington University.

20      Q     And returning to Exhibit 3, the interview in

21    Chicago with Mr. Wolter, where did you meet?

22      A     In his office.

23      Q     And what was discussed?

24      A     We talked about what he thought I  might be

25    working on there and in particular I remember questioning

1  him about and been made apparent to me by Rachel and other

2  people that I talked to that I was being hired to fill

3  requirements, additional requirements placed on NORC by

4  their recent acquisition of the National Immunization Survey

5  so I was quite concerned with that and I asked him

6  specifically is this is a solid project and am I going to

7  retire and come over here and is this requirement for the

8  extra staff that they need to meet the staffing requirements

9  imposed by the NIS going to last for a while and he said yes

10 and because that, of course, was one of the prime factors.

11 It wasn't going away probably.

12          NORC is a good organization.  It has a good

13 reputation where they get a contract they will probably keep

14 it and satisfy their client which is one of the reasons that

15 I was going there and also the reason I was being hired.

16          So, that was one of the things that I discussed

17 with him.  And the others were probably less memorable.  I

18 think I, of course, told him about the work I was doing at

19 the Bureau of Labor, not Bureau of Labor Statistics, but,

20 the Postal Service and that we might find a contract with

21 them sometime in the vague future working on the redesign

22 work that I was in the middle of when I left the Postal

23 Service.

24     Q    What exactly did Mr. Wolter say specifically?

25          MR. HANTZES:  Asked and answered.

1        BY MR. BURNS:

2    Q    What exactly did Mr. Wolter say?

3    A    Specifically, I don't remember the exact words, of

4  course, but, he said that we have this contract that's solid

5  and if it's the basis for you coming over here you can

6  pretty much depend on it.  It's going to be roughly five

7  years in duration if we don't get it renewed and if we do it

8  could go on indefinitely.

9    Q    So, that was your impression?

10   A    Right.  Yes.

11   Q    Now, you said earlier --

12       MR. HANTZES:  Objection.  Are going to allow me to

13  say the word objection and complete my objection?  You

14  really need to play by your own rules.  Objection.

15  Mischaracterizes his testimony.

16       MR. BURNS:  You made your objection.

17       BY MR. BURNS:

18   Q    Mr. Woodruff, --

19       MR. HANTZES:  Counsel, counsel, --

20       MR. BURNS:  You made your objection.  I didn't say

21  anything.

22       MR. HANTZES:  It's very important for you to

23  understand that providing the right to counsel to make his

24  objection and complete it is just as important as your right

25  to ask the question and if you don't respect that right

66

1  I definitely talked to him about.  One was the NIS and the

2  other is what I was doing at the Postal Service and maybe

3  the potential for a future NORC contract with them to

4  continue the redesign work that I had been doing for the

5  Postal Service when I left.

6      Q    And do you recall anything else that you said

7  about what was said during your interview with Mr. Wolter?

8      A    No, just really those two items.

9      Q    Okay.  Then on Exhibit 3, one person that's listed

10 here that we have not discussed or at least not discussed in

11 greater detail is Rachel Harter.  And who is she?

12     A    She's the vice-president or one of the vice-

13 presidents who -- well, it says administrative director down

14 here and I know --

15     Q    To the best of your recollection.

16     A    Yes, I'm afraid I'm really not aware of her -- the

17 total scope of her duties.  But, she's one of their vice-

18 presidents and she was very interested in the projects that

19 I was working on and I was working directly for her so it

20 was at least the Residential Energy Consumption Survey and

21 several more surveys that were associated with that survey.

22     Q    I apologize.  Let me back up here to to Mr.

23 Wolter, the interview with him.  Was anybody else present

24 other than the two of you?

25     A    No.

67

1       Q    Okay.  Back to your meeting with Ms. Harter.  You

2   met with her in Chicago when you were out there

3   interviewing, correct?

4       A    Yes.

5       Q    And where did you meet with her?

6       A    In the -- excuse me -- in the placement facility

7   at the Joint Statistical Meetings.

8       Q    No, I'm sorry, in Chicago.

9       A    Oh, in Chicago.  Oh, in her office, yes.

10      Q    And was anybody else present other than the two of

11  you?

12      A    No.  Maybe I shouldn't say absolutely no to that.

13  I'm really not sure if anyone else was present at that

14  meeting.

15      Q    And what was discussed during that meeting or

16  interview with Ms. Harter?

17      A    The kind of work that -- I think it got a good

18  deal more specific on the kind of things that I had doing

19  with the Postal Service and how they would fit in with NORC

20  activities and I don't think we had gotten specific as

21  deciding what survey I would be working on at that point.

22  But, I wanted to make sure that I had a decent background in

23  sampling theory and probably household surveys since they do

24  a lot of household surveys and, indeed, the RECS is a

25  household survey.

68

1        Q        Do you recall anything else that was discussed?

2        A        No.

3        Q        Do you recall the exact words Ms. Harter used in

4    discussing with you what you just mentioned?

5        A        No, but, I would -- no, I really don't remember an

6    awful lot about that particular interview.

7        Q        Did she mention the RECS project?

8        A        It's very likely since that's what she was hiring

9    me to do.

10        Q        And how did you know she was hiring you for the

11    RECS project?

12        A        Well, I didn't at the time.  I don't think I knew

13    I was going to be working on the RECS project until actually

14    after I was hired.  I wasn't sure whether I'd be working on

15    the National Immunization Survey or a survey that where

16    staff had to be moved from, like the RECS, for example, to

17    the National Immunization Survey.

18        Q        During your interview with Ms. Harter did she

19    mention the National Immunization Survey?

20        A        Yes.  We did discuss that just as I did with Kirk

21    Wolter just to be sure that it was a pretty solid project.

22        Q        And what precisely did she say about the National

23    Immunization Survey if you can recall?

24        A        All through the interview when I was talking with

25    Wolter and the vice-presidents I -- I did make -- make it

69

1  clear that my move to NORC would be contingent on them

2  having sufficient work for me and that work apparently

3  depended on how long or the duration of the National

4  Immunization Survey.

5      Q    Do you recall precisely what she said?

6      A    No, I don't.

7      Q    Do you recall precisely what you said?

8      A    No.

9      Q    Other than the people who were just discussed

10 identified on Exhibit No. 3 did you interview with anyone

11 else at NORC in 2004 or 2005?

12     A    No.

13     Q    And were all those interviews that we just

14 discussed on one day?

15     A    Yes.

16     Q    And after that day of interviews did you have

17 communications with NORC personnel?

18     A    Yes.   I had discussions with my e-mail and

19 telephone over the next several weeks with Rachel finalizing

20 what I'd be doing and if I was going to hired and then she

21 sent an e-mail to me probably in January saying that she had

22 okayed things up through Craig Coelen and she had sent

23 things down to HR so they could do the official hiring.

24     Q    Tell me about the telephone calls.  How many

25 telephone calls did you have with Rachel?

70

1      A      I don't know.

2      Q      Do you recall the number?

3      A      Three or four.  I'm not sure exactly.

4      Q      Okay.  Do you recall when those phone calls

5   occurred?

6      A      Between the -- they were probably a good week.

7   They started a good week after the 10th of December but they

8   would have been --  I think it took them that long to

9   evaluate after the interview.

10      Q      And what was said during those phone calls with

11   Rachel?

12      A      She would say yes, we're working on it and we

13   would like to hire you.

14      Q      Anything else?

15      A      That's all.

16                              (Deposition Exhibit No. 4 was

17                              marked for identification)

18      BY MR. BURNS:

19      Q      Mr. Woodruff, you have before you what's been

20   marked as Exhibit No. 4.  Do you recognize this?

21      A      No, but, it looks like an e-mail that I probably

22   already read.  I think I have a packet of e-mails and I'm

23   sure I sent.

24      Q      Do you have a packet of e-mails -- did you have

25   this packet of e-mails prior to filing your lawsuit?

98

1      Q    So, when you signed this letter you understood

2  that you would be an at will employee and had no guarantee

3  of continued employment, is that correct?

4      A    Well, it had been represented to me that I would

5  be there for the duration of the contract for the National

6  Immunization Survey and I took that as part of the promise.

7      Q    Okay.  And then let's look at the second page

8  above your signature, the second sentence there, why don't

9  you go ahead and read at that whole two sentence paragraph

10  above your signature.

11      A    I understand and accept the terms of this offer of

12  employment.  I understand that this offer provides no

13  guarantee of continued employment for specific compensation

14  level nor does it constitute an employment contract, either

15  expressed or implied.

16      Q    So, wouldn't you agree then that the language in

17  this letter referring to at will employment and the language

18  in here saying that it provides no guarantee of continued

19  employment is contrary to the representations you made

20  regarding the length of employment you would have at NORC?

21      A    It appears to be, but, it also says that this is

22  not a contract and I interpreted the contract as the verbal

23  representations made to me when I visited NORC as an

24  important condition for my retiring from the Postal Service.

25      Q    Let's look back at page 1.  Look at the second

99

1    paragraph, the first sentence says your salary will be

2    $108,000 annually and earned and paid at the bi-weekly rate

3    of $4,153.85, end quote.  Do you see that?

4        A    Yes.

5        Q    So, did you expect that that would be a term of

6    your employment with NORC that they would pay you $108,000

7    annualized salary?

8        A    Yes, with -- with -- well, according to the --

9    with salary reviews annually as stated in the second

10   sentence.

11       Q    Okay.  And then why don't we look at the next

12   paragraph down which talks about eligibility for paid time

13   off and the last sentence in that paragraph says you will

14   have -- excuse me -- quote, you will accrue PTO at the rate

15   of .10 hours for each hour paid service, the annual

16   equivalent of 26 days per year for a full time employee,

17   closed quote.  Do you see that?

18       A    Yes.

19       Q    So, did you expect that that would be a term of

20   your employment with NORC?

21       A    Yes.  And I imagine that is probably across the

22   board for all their employees, is that not correct?

23       Q    And in the next paragraph it generally says you

24   will be eligible to participate in the NORC's employees

25   benefits package.  Do you see that?

100

1      A     Yes.

2      Q     Did you expect that as part of your employment

3   with NORC the term that you would be eligible to participate

4   in the employee benefits package?

5      A     Yes.

6      Q     So, isn't it a fact then that you knew that you

7   would be an at-will employee with no guarantee of continued

8   employment at NORC based on this letter?

9           MR. HANTZES:  Objection.  Asked and answered.

10          MR. BURNS:  You can answer.

11          THE WITNESS:  Not an at-will employee in that

12  sense.  It would have been linked to the National

13  Immunization Survey contract.  If that had fallen through

14  then that's what I was taking a chance on I suppose.  I

15  didn't expect if anything didn't happen to that that I would

16  be terminated.

17          BY MR. BURNS:

18     Q     Mr. Woodruff, in this Exhibit 9, where in here

19  does it say that you're the employee for the length of the

20  NIS contract?

21     A     That was a representation made to me during my

22  interviews in Chicago.

23     Q     Previously?

24     A     Yes.

25     Q     By whom?

1  that form you could have chosen to stay with and employed at

2  the Postal Service, is that correct?

3       A    Certainly.  As I just said, I was offered a small

4  salary increase to stay.

5       Q    And how much of a salary increase?

6       A    I don't know.  Ross Bailey made the offer at the

7  going away luncheon.  He said, well, I offered Steve

8  additional money to stay and I didn't request it and I

9  didn't look into what the additional amount would be.  It

10  would have been a few thousand dollars perhaps.

11                    (Discussion off the record)

12     (Whereupon, a luncheon recess was taken at 12:51 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

110

1          A F T E R N O O N   S E S S I O N

2          BY MR. BURNS:

3      Q    Mr. Woodruff, we're back on the record after a

4  lunch break that turned out to be 40 minutes, 50 minutes

5  instead of 30.  You understand you're still under oath?

6      A    Yes.

7      Q    What projects did you work on while you were

8  employed at NORC?

9      A    Primarily the Residential Energy Consumption

10 Survey, an Airlines Passenger Survey, and several other

11 smaller projects, the details of which escape me at this

12 point.

13     Q    Do you recall anything about those other smaller

14 projects?

15     A    Little special projects.  Rachel would call once

16 or twice with some kind of an emergency that perhaps

17 somebody in the next room was working on and could I help

18 with it for a few hours.  I remember one thing.  I have no

19 idea what it dealt with exactly, but, it was a quick little

20 poke into some of their data sets using SAS or some other

21 programming language I could help her with for a short time

22 and a few other little things.

23          And there are several other surveys connected to

24 the RECS survey done by other contractors, but, I'll just

25 refer to those other, those as RECS-connected surveys

1  because I don't remember their names or exactly what I did

2  on them.  Energy Supplier Survey, I believe, is a name that

3  comes to mind.

4       Q    What did you do on the Airline Passenger Survey?

5       A    I had to write up a document that comes before a

6  request for proposal basically advertising NORC saying, you

7  know, we have the best statisticians and we really know what

8  we're doing and we can help you out and do a great job on

9  this so consider us, that sort of thing.  And, of course, I

10  had templates to go from people who had written similar

11  papers for us so I could have a look at what other people

12  had written on other projects and follow those formats

13  through and I worked on that pretty much alone although I

14  was supposed to be getting input from other workers.

15            That was the last thing I did.  I finished that

16  off and then out the door and I was going pretty hard on

17  that for a couple of weeks at least before I left.

18       Q    What were you doing with respect to RECS or what

19  did you do?

20       A    Writing and more writing, looking at sample

21  designs, writing up specifications.  Exactly what, there are

22  too many details to recall.  I'm not exactly sure what that

23  first document that I was writing on.  It primarily involved

24  at that stage learning.  There was not a lot to learn about

25  these surveys.  I did a lot of reading and a fair amount of

112

1  writing too because I wanted to send my ideas to the people

2  in Chicago, Rachel and the rest of the people on her staff

3  so they could comment on it and see how I was doing, was I

4  getting the ideas correctly.

5      Q    And what was the response you got?

6      A    Well, it was generally very helpful.

7      Q    What kinds of responses did you get from Rachel or

8  whomever you sent?

9      A    I'd get substantial comments about the wording and

10  the content.

11      Q    Things that needed to be revised or changed?

12      A    Sure.  You know, those documents need permanent

13  revision here surely and the more time you can spend

14  revising them the better they're going to be and I'm not

15  sure that I've ever seen one that has been revised to the

16  point where it can't be improved by another revision.  You

17  devote as much time as you can and when the time runs out

18  then that's your finished product pretty much.

19      Q    Did you ever work on the NIS project?

20      A    No.

21      Q    Did you ever ask anybody at NORC why you weren't

22  working on it?

23      A    No.  That was not one of the -- I was hired

24  because of the NIS but necessarily to work on the NIS.  That

25  was made clear from the time Rachel contacted me which was

113

1  actually three months after my interview in August.  I

2  believe it must have been November when she called me and

3  said, well, we've got the NIS and we need you now.

4        Q     And you were terminated from NORC, is that

5  correct?

6        A     Yes.  Yes, and that was interesting too because

7  the reason I was terminated was because the NIS was lost

8  apparently.  I found out later that that wasn't true.  I

9  think I talked to somebody actually in Atlanta several

10 months after I was terminated who -- and I wish I could

11 remember his name. I probably have it somewhere -- who

12 monitors that survey, a government employee, and he was

13 unaware of any change in the NIS and I started getting

14 particularly concerned.

15       Q     What date were you terminated if you can recall?

16       A     I think it was the 16th of June.

17       Q     2005?

18       A     Yes.

19       Q     And how did you learn you were being terminated?

20       A     Pardon me?

21       Q     How did you learn you were being terminated?

22       A     Oh, that's an interesting one too because two

23 weeks or perhaps less than that before I was terminated

24 Rachel called me and said that I was going to be officially

25 supervising the staff that I had been working with and

114

1  getting up to speed on and then I was called in to HR on

2  that Thursday.

3           Rachel is in town and she was sitting in there at

4  least with the HR representative in Washington and perhaps

5  one other person.  It might have been the executive vice-

6  president that she referred to in her deposition and he

7  said, oh, have a seat and I was thinking I wonder if this

8  has something to do with the promotion then.

9           So, she got Andre.  Let's see, his name is here.

10 Andre Prima on the telephone in Chicago and his conversation

11 started out, well, no, something like I wish I had been able

12 to meet you here and I'm sorry, I know Rachel has just told

13 you that you've been terminated and I want to go down and

14 check the list of all the needs that you need to do now,

15 referring to all these things.  Well, I didn't have any of

16 that.

17          That was the first time heard about it.  The

18 letter of termination was wrong that Rachel had not told me

19 anything prior to termination about termination.

20     Q    This time when you were called into HR here in

21 D.C. when Rachel was in town was that the June 16th, 2005

22 date?

23     A    Yes, that would have been the last because that

24 was literallly the last ten minutes I was in the building.

25 After that, the phone call was over with.  I got a cardboard

1  box and left.  I picked up pictures of my family and a few

2  of the textbooks and left everything else there that I don't

3  think -- I might have actually left a book or two that I

4  don't seem to have any more that I didn't get out of the

5  office in time.

6       Q     Did Rachel say anything to you when you were

7  called into the HR?

8       A     No.  She was in HR waiting with the other people

9  and someone just called me to go over to HR and I met some

10  people that I hadn't talked to before, but, that was the end

11  of my employment with NORC.

12       Q     Who told you you were terminated?

13       A     The man on the telephone, Andre Prima from

14  Chicago.  Nobody in Washington told me I was terminated.

15       Q     Did Rachel tell you you were terminated?

16       A     No. No.

17       Q     She didn't say anything about --

18       A     No, absolutely nothing.  It was a complete

19  surprise.  I sat in there and the first time I heard it was

20  when it came over the speaker phone from Andre Prima in

21  Chicago.

22       Q     Other than what you've told me, did Mr. Prima tell

23  you why you were being terminated?

24       A     Yes, NIS.

25       Q     Anything else?

116

1      A    That's it.  That was the reason.  They lost it and

2   they were terminating me for that reason.

3      Q    So, Rachel was present but she didn't say anything

4   at all?

5      A    That's the way I remember it.  She didn't do

6   anything until the meeting was over with and then she got a

7   large box for me so I could -- it really only took half of

8   one box to put my personal things in and then I left.

9      Q    So, to your knowledge prior to the time you filed

10  this lawsuit who was responsible for firing you?

11         MR. HANTZES:  What do you mean responsible?

12  Objection to the word responsible.  Are you referring to who

13  told you it or who --

14         THE WITNESS:  Who was responsible for firing me?

15  I -- that depends on what exactly that means, but, from the

16  deposition that I read, and that's the only thing I'm going

17  on now is Rachel's deposition I read last night, she made

18  the decision along with Carol Emmons who send our names

19  forward as people to terminate and that would have been

20  probably, you know, a month before I was.

21     Q    Prior to filing your lawsuit, to the best of your

22  knowledge who do you think was responsible for firing you?

23     A    Well, the cause -- the cause was the termination

24  of the National Immunization Survey and they simply didn't

25  need me anymore.  It was the down staffing.  That's what I

1  thought for quite a while.

2      Q    Well, you just described for me that Mr. Prima was

3  the one.

4      A    He was the one -- right, he called.  He's the

5  human resources person who passed the -- he's the first

6  person I heard from about the -- my termination.

7      Q    Who was present during that call with Mr. Prima?

8  Ms. Harter was present, correct?

9      A    And apparently an executive vice-president which

10 Rachel mentioned in her deposition was there and I vaguely

11 remember another person but it might have been the HR.

12 Rachel, the Washington HR man or woman, and the executive

13 vice-president and she mentioned him in her depo.  I had

14 never met him before that time or if I had it had been very

15 casually.

16     Q    Mr. Woodruff, I just want your recollection.  To

17 the best of your recollection who was present, not based on,

18 you know, what Rachel said.

19     A    To the best of my recollection who was present by

20 name, the only person I know by name besides me was Rachel

21 and there were a couple of other people there.  And the best

22 of my recollection would have been, since we were meeting in

23 the HR office to do this that at least one of those two

24 other people that was there was their HR person in

25 Washington, but, I don't know.

118

1    Q    There was at least one other person?  Is that what

2  you're saying?  I'm sorry.

3    A    Yeah.  There were -- the way I remember it, there

4  were four of us sitting at the table.  I was one.  Rachel

5  was the other and there were two additional ones.

6    Q    And were they male or female?

7    A    At least one was male and I'm not sure about the

8  other one.  And it could have been just three people, but,

9  it was something -- something along the lines of three or

10 four.

11          MR. HANTZES:  You've answered it.

12                              (Deposition Exhibit No. 11 was

13                               marked for identification)

14          BY MR. BURNS:

15    Q    Mr. Woodruff, you have before you what's been

16 marked as Exhibit No. 11.  Do you see that document?

17    A    Yes.

18    Q    And do you recognize this document?

19    A    Yeah, I think I have looked at this before, but, I

20 really --

21          MR. HANTZES:  Look at the whole thing.

22          THE WITNESS:  Yes.  Now I'm starting to recognize

23 more of it.

24          MR. HANTZES:  Well, read the whole thing and then

25 answer the question.  Look over the whole thing.

1   their names.

2       Q    And what did Rachel Harter and Kirk Wolter say

3   exactly if it's any different than what you told me already?

4       A    No, it wouldn't be any different.  Kirk Wolter, as

5   I said, I asked him specifically I'm being hired because of

6   the ramp up for this survey; how long is it going to go on

7   and he answered very specifically the term would be about

8   five years.

9       Q    And when you say very specifically the term would

10  be for about five years the term of what?

11      A    The National Immunization Survey contract.  Of

12  course, it could go on longer than that.  They probably

13  could get it renewed.

14      Q    Okay.  Then let's look at paragraph 16-2.  It goes

15  from A to 2.

16      A    Oh.  Uh-hmm.

17      Q    Go ahead and read that and I want you to tell me

18  who made these statements.

19      A    Rachel Harter and Kirk Wolter and they would have

20  been probably general knowledge so there could have been

21  other people that were working on that survey as well;

22  should be; maybe he was working on it.  I don't know.  But,

23  those two I know for sure and it wasn't exactly five years.

24  It was approximately.  It wasn't canceled.

25      Q    All right.  And what specifically did they say

132

1  term of the contract or term of the project.  Clearly, it

2  wasn't.  It didn't work out that way.  I was working there

3  for three and a half months.  And in spite of the fact they

4  represented to me the NIS was terminated, it wasn't, but, I

5  was.

6      Q    At the time -- well, let's look then at paragraph

7  16-3, that statement that you attribute to Rachel Harter.

8  When did she make that statement to you?

9           MR. HANTZES:  Asked and answered.

10          THE WITNESS:  I'm really not sure whether it was

11  in November or December.

12          BY MR. BURNS:

13     Q    And at the time that she made that do you think

14  she knew that it was a false statement?

15     A    I don't know.

16     Q    So, it's possible she didn't know it was an

17  incorrect statement?

18     A    Yes.  I mean, I really can't know what she was

19  thinking.

20     Q    At the time these statements in paragraph 16 were

21  made do you think that either Rachel Harter or Kirk Wolter

22  intended to deceive you?

23     A    And, once again, I'll answer the same way.  I

24  really don't know what the motivation was for this, whether

25  it was just something like, what's the right word,

133

1    negligence or -- or intent.

2         Q    Do you think they intended to deceive you though?

3         A    I don't know.

4         Q    So, you don't know whether they intended to

5    deceive you?

6         A    No, I don't.  It's certainly in light of other

7    things I guess it's possible.

8         Q    It's possible and it's also possible they did not

9    intend to deceive you?  Is that correct?

10        A    Yes, yes, yes.

11        Q    And you said it's possible in light of other

12   things.  What other things?

13        A    Well, it was really a peculiar process of

14   termination, wasn't it, to be implicitly promoted when the

15   person promoting you knows they're going to fire you within

16   the next two weeks.

17        Q    Who told you you were promoted?

18        A    Rachel Harter again.

19        Q    What exactly did she say?

20        A    She said, well, you're now the supervisor for the

21   statisticians working on RECS and that was around the first

22   of June, somewhere in that first week of June.

23        Q    Was this an in-person meeting or on the phone?

24        A    We had almost no in-person meeting since

25   everyone's in Chicago.  The only time she was down here

1  know their people a little bit better like the field staff

2  and my co-workers.

3      Q    Do you think NORC hired you knowing it was going

4  to have layoffs four months later and lay off various people

5  including you?

6      A    Once again, I really don't know.  It turned out

7  that way and in Rachel's depositions it also sounded like it

8  could have been something like that because from what she

9  said when she hired me she actually only had two months

10 worth of work.  And, of course, that wasn't stated to me

11 during the interview.

12     Q    Okay.  Let's look at paragraph 28.  Why don't we

13 compare it with paragraph 16 and maybe we can agree that

14 those are identical paragraphs.

15         MR. HANTZES:  Which ones?

16         MR. BURNS:  Paragraphs 16 and 28.

17         THE WITNESS:  The difference between the fraud and

18 the negligent misrepresentation.  That's --

19         MR. HANTZES:  Yeah, they're the same paragraph.

20         MR. BURNS:  Okay.

21         MR. HANTZES:  He asked me whether the words were

22 the same.

23         MR. BURNS:  Yeah.

24         MR. HANTZES:  He's just asking not in the context

25 of the claim but just is it the same thing.  Did I cut and

138

1    paste them which is really the question.

2              BY MR. BURNS:

3         Q    So, Mr. Woodruff, then all the statements in

4    paragraph 28 that you attribute to NORC, the same people

5    that we just discussed?

6         A    That's right.

7         Q    It's the same thing, right?

8         A    Uh-hmm.  I mean, yes.

9         Q    Do you think that statements you attribute to Ms.

10   Harter and statements you attribute to Mr. Wolter that they

11   should have known that these statements were false?

12        A    Yes.

13        Q    How should they have known that?

14        A    Well, I made it very clear to both of them when I

15   was interviewing that I was leaving based on their

16   representation of what would be available at NORC and for

17   how long.

18        Q    Well, let's look at --

19             MR. HANTZES:  Did you finish your answer?  I don't

20   know if he was --

21             MR. BURNS:  All right.  I didn't realize.

22             MR. HANTZES:  If you were that's fine.

23             THE WITNESS:  Go ahead.

24             BY MR. BURNS:

25        Q    Well, let's go ahead and look at 28-A, paragraph

142

1          MR. HANTZES:  Objection.  Objection.

2          THE WITNESS:  At the time that I made it I -- it

3    was accurate.  It was the way it was being represented to

4    me.  I didn't have much chance during my termination

5    procedures to get into the details of whether it was

6    completely terminated or not touched or all or partially

7    terminated or exactly what, but, from my perspective it was

8    canceled and that's the way it was represented to me by

9    Andre Prima.

10          BY MR. BURNS:

11     Q    All right.  Let's turn to page 6 of the complaint,

12    Exhibit 12.  And do you see that Count Three, breach of

13    contract in the middle there?

14     A    Okay.  I'm perhaps not looking -- I'm in 6?

15     Q    I'm sorry, not paragraph 6, page 6.

16     A    All right.  Very good.  All right.  Go ahead.

17     Q    What do you claim constituted your contract with

18    NORC?

19     A    A combination of telephone calls from Yvonne in

20    which we hadn't talk about a sum of money being paid as a

21    salary of $108,000.  The talk, the representations made by

22    Kirk Wolter and Rachel Harter about the duration of the

23    contract and then some of the fringe benefits in the letter

24    of --

25     Q    You can refer back to other examples.

1    A    -- in January.

2    Q    That's Exhibit?

3    A    Exhibit 9.

4    Q    Nine.  So, some of the things in Exhibit 9

5    constitute part of your contract?

6    A    Yes.  Some of those -- well, yeah, as it states,

7    of course, that's not really a contract, but, I would think

8    we have a written contract in this case and it's a

9    combination of all the representations made by Harter and

10   Rachel or Harter and Wolter; the benefits in that and the

11   telephone conversation also with Yvonne which really just

12   dealt with would he come to work for us for $108,000 a year

13   and that was it.

14   Q    Okay.  Let's look at then paragraph 42.  In

15   particular paragraph 42-A and B.  Do you see those, Mr.

16   Woodruff?

17   A    Yes, I do.

18   Q    Would you agree with me that 42-A and B are

19   identical in substance to what was in 16-A, paragraph 16-A

20   and paragraph 16-2?

21   A    Yes.  It looks to be like they were simply

22   highlighted and copied over.

23   Q    All right.  So, the same things you told me about

24   16, paragraph 16-A and 16-2 would apply to 42-A and 42-B.

25   What I mean, what it says.  Okay.  How have you been damaged

182

 1   conversation either on the 5th or the 6th with Yvonne

 2   Johnson, is that correct?

 3          MR. BURNS:  Objection.  Asked and answered.

 4          THE WITNESS:  I had a conversation around the 5th

 5   or 6th with Yvonne Johnson and based on these e-mails we can

 6   probably tie it down, but, exactly --

 7          MR. HANTZES:  Okay.

 8          BY MR. HANTZES:

 9      Q   And you remember one conversation with her, is

10   that correct?

11      A   Yes.  And I -- yes, that's right.

12      Q   And during the conversation what, if anything, did

13   she tell you about being an employee at will?

14          MR. BURNS:  Objection.  Asked and answered.

15          THE WITNESS:  Nothing.  Don't think that was asked

16   before.

17          MR. HANTZES:  No, you don't have to respond to his

18   objection.  Okay.  And if I'm in his shoes if I think maybe

19   it as asked I would make the objection so you should answer

20   just like you would with mine.

21          THE WITNESS:  Yes.  No one explained to me.  I

22   didn't run across that term at all during the course of the

23   interviews or the discussions with either Yvonne Johnson,

24   Rachel Harter, Kirk Wolter, or anyone else.

25          MR. HANTZES:  Okay.

1          THE WITNESS:  The statisticians at NORC or human

2   resources staff.

3          BY MR. HANTZES:

4    Q    Do you remember Exhibit 7 refers to you calling

5   back and accepting the offer?  Is that correct?

6          MR. BURNS:  Objection.  Mischaracterizes.

7          MR. HANTZES:  Let's strike that.

8          BY MR. HANTZES:

9    Q    Do you remember calling -- so what did she tell

10  you in that conversation?

11         MR. BURNS:  Objection.  Asked and answered.

12         THE WITNESS:  We made this --

13         MR. HANTZES:  No, I don't want you to read it.

14         THE WITNESS:  Okay.  I remember one call from

15  Yvonne Johnson and that was around dinnertime in early

16  January and she said I'm making you an offer for a salary of

17  $108,000 a year and accept, yes or no.  Oh, I did add one

18  thing. I asked her that the fact that I already had medical

19  insurance I wouldn't be taking advantage of theirs so that

20  would alter things upwards a little bit and she said no and

21  I said fine, that's it, I'll take it.

22    Q    Okay.  So, there's no discussion of at will and

23  the only thing that was discussed was the salary?

24         MR. BURNS:  Objection.  Leading.

25

 1          BY MR. HANTZES:

 2     Q     Who?  You discussed with who?

 3     A     With Rachel Harter primarily and, of course, Kirk

 4  Wolter confirmed by Kirk Wolter who is the man in charge of

 5  the National Immunization Survey or at least one of them.

 6     Q     And what part of your contract did they discuss

 7  with you?

 8          MR. BURNS:  Objection.  Vague.  Objection.

 9          THE WITNESS:  We didn't -- we didn't get into very

10  on pay and benefits.  Anything in that range that I was

11  offered they could have offered $10,000 less I would have

12  probably taken that just as well.

13          BY MR. HANTZES:

14     Q     But, what I'm asking you is what part of your --

15  what was your contract of employment as of your accepting

16  this conversation on or about January 6th.  What was the sum

17  and substance of your conversation?

18     A     That I would be working for about the sum that I

19  had got and for a duration of approximately the National

20  Immunization Survey or the time that they would be working

21  on that contract survey.

22     Q     And so that's what -- as you sit here today what

23  do you consider to be the terms and conditions of your

24  employment?

25          MR. BURNS:  Objection.  Asked and answered.

186

1          THE WITNESS:  That I would be working for NORC on

2  anything they assigned me to for a period of approximate

3  duration of the National Immunization Survey.  It could be

4  the National Immunization Survey or it could be any other of

5  their projects.

6          BY MR. HANTZES:

7      Q     And yet any other aspects?

8      A     No.  I didn't -- I didn't really get into benefits

9  like 401(K)'s, retirement, medical because I already had

10  them, a lot of those things covered and I wasn't worried too

11  much about minor details, just the important things.  A

12  figure of around $100,000 for about five years and it

13  sounded like they had accepted those.

14      Q     Okay.  When you say five years you mean the

15  duration of the contract?

16      A     Right, right, an approximate.

17      Q     Okay.  Now, let's turn to Exhibit 9.

18      A     All right.  I have it.

19      Q     Okay.  And I want to turn your attention to the

20  paragraph right above your signature.  In light of the

21  conversation, in light of what you just testified to, what

22  was the significance in your mind in this letter of the

23  terms that in this letter that the words does not constitute

24  an employment contract either expressed or implied?  How did

25  you construe those terms in light of what you had been told?

187

1    A    Well, everything in this letter was somewhat

2  ambiguous and I would take this in the context of my

3  discussions with Rachel Harter and Kirk Wolter during the

4  interview process.

5    Q    Okay.  But, and, of course, there is in the sense

6  that the National Immunization Survey is solid but it's not

7  certain that would be -- and, therefore, my continued

8  employment is not necessarily guaranteed as it states in

9  here so it's contingent on the National Immunization Survey

10  continuing.

11    Q    Okay.  So, when you read this -- okay, so, what

12  did you understand that the offer was -- that the term that

13  the offer was not guaranteed, that the offer didn't

14  guarantee your continued employment, guarantee a continued

15  employment, how did you construe that?  What did you

16  construe that to reference?

17    A    Well, anything can happen.  The company could go

18  out of business.  In this case, the main problem would be

19  the cancellation of the contract for the National

20  Immunization Survey.

21    Q    Okay.  And when they make reference over here in

22  on page 1 what did you construe it to mean the context that

23  it was at will which they could discontinue your employment?

24  What did you construe that to mean in the context of the

25  conversations you were having?

188

1        A    The usual, the contingency if the company goes out

2   of business or the contract was canceled or, you know, --

3        Q    Did anybody ever tell you -- go ahead.

4        A    The term at will was never mentioned before or

5   after this letter until now.

6        Q    Did anybody ever tell you that if the contract --

7   if the work on the contract goes down in part that you would

8   be terminated?

9             MR. BURNS:  Objection.  Leading.

10            BY MR. HANTZES:  Down by a certain percentage.

11            MR. BURNS:  Same objection.

12            THE WITNESS:  Well, no they didn't.  We didn't

13   discuss that.  Either they have it or they don't.  But,

14   apparently that isn't quite -- it isn't quite as simple as

15   that, but, I didn't.  It's something that I wasn't aware of.

16            BY MR. HANTZES:

17        Q    That you were not told?

18        A    Uh-huh.

19        Q    Okay.  All right.  Now, let me ask you a question.

20   You testified that you read the deposition of Rachel Harter.

21   Was that correct?

22        A    Yes.

23        Q    And was there anything in that depo about her

24   evaluation of your skills that was surprising to you?

25        A    Yes. It was interesting that she says in December

1   when she was interviewing me she had doubts about my ability

2   to perform the tasks that I was going to be assigned to.

3       Q    Did she ever disclose that to you at any time

4   during the interview?

5       A    No.

6       Q    Had you known that, had she disclosed that in any

7   way that she had -- that she was uncertain about your job

8   skills would you have accepted the job?

9       A    Probably not.  I -- I -- I went over there because

10  I felt that I had a very solid guarantee of employment as

11  long as I performed well or adequately.

12      Q    And when did you first learn that she had those?

13  Well, was it reading her deposition the first time you

14  learned this?

15      A    Yes.  As I said, right up to the time I was

16  terminated the feedback was positive.

17      Q    Okay.  That's another question I want to ask.  Did

18  anybody at any time while you were working there tell you

19  that your performance was deficient?

20      A    No.

21           MR. BURNS:  Objection.  Leading.

22           MR. HANTZES:  Let me change it from a non-leading

23  question.

24           BY MR. HANTZES:

25      Q    What, if anything, was the evaluation of your work

AMBASSADOR LEGAL SERVICES (800) 486-9868