**ORIGINAL**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEPHEN WOODRUFF,              )
                               )
        Plaintiff,             )
                               )
    vs                         )  No. 1:06-CV-00832(RJL)
                               )
NATIONAL OPINION RESEARCH      )
CENTER,                        )
                               )
        Defendant.             )

The discovery deposition of RACHEL HARTER, called by the Plaintiff, for examination, pursuant to notice, taken before GEANNA M. IAQUINTA, CSR, at Suite 2400, 131 South Dearborn Street, Chicago, Illinois, on the 17th day of November, A.D., 2006, scheduled to commence at 12:30 p.m., commencing at 12:31 p.m.

1       are.

2              MR. BURNS:  Come on.

3              MR. HANTZES:  Yes, they are.

4              MR. BURNS:  No, but -- we'll

5       object to that, but go ahead.

6              MR. HANTZES:  All right.

7       That's fine.

8  BY MR. HANTZES:

9       Q.     What did you have in mind for him

10  to work on, the RECS thing?

11      A.     Yes.  In 2004, yes.

12      Q.     Okay.  Well, who decided to hire

13  him?

14      A.     It was my recommendation.  I needed

15  approval, but it was my recommendation to hire

16  him.

17      Q.     Okay.  And you had in mind that he

18  would work on something outside of your

19  department?

20      A.     Most of my staff work on projects

21  outside of my department.  We are a support

22  department.

23      Q.     Okay. Did you talk to Christine --

24  Krishna --

1    A.    Krishna.

2    Q.    -- Winfrey prior to hiring Steve?

3    A.    Yes.

4    Q.    Did you talk to her about hiring
5 Steve?

6    A.    Yes.

7    Q.    Did she interview Steve?

8    A.    Yes.

9    Q.    Okay. And what did she say to you
10 about the resume -- I mean, about his
11 qualifications?

12    A.    I don't recall precisely what she
13 said. I don't think she had an objection.

14    Q.    Okay. Anything else that you had
15 in mind for him to work on?

16    A.    Not specifically.

17    Q.    How many man-hours was going to be
18 involved with the RECS matter?

19    A.    Initially, it would be full-time
20 and then after --

21    Q.    And initially is how long?

22    A.    A couple months maybe and then he
23 was supposed to cut back to half time.

24    Q.    And then what else did you have in

```
 1           interviewing --
 2              MR. HANTZES:  Oh, all right.
 3      The interview process?  Okay.
 4      That's fine.  I'll agree to that.
 5      That's interviewing.
 6              MR. BURNS:  Okay.
 7              MR. HANTZES:  Thanks.
 8              THE WITNESS:  So which are we?
 9              MR. BURNS:  It shouldn't
10      matter for your purposes.  You just
11      answer the questions.
12              THE WITNESS:  Okay.
13   BY MR. HANTZES:
14         Q.   You interviewed him in 2002?
15         A.   Yes.
16         Q.   How is it that you came to
17   interview him?
18         A.   I'm trying to recall.  I think he
19   sent his resume to NORC.
20         Q.   And you interviewed him?
21         A.   Yes.
22         Q.   And what happened at the end of
23   that interview?
24         A.   He met a number of individuals
```

1    while he was interviewing at NORC. I called a
2    couple of his references. We thought about it
3    a lot and ultimately decided not to make an
4    offer.
5         Q.    Why?
6         A.    We needed a very strong senior
7    statistician. Our department was smaller at
8    that time, and we had doubts if he was the
9    right person to fill that role.
10        Q.    Okay. What were the nature of the
11   doubts?
12        A.    His background, while it was strong
13   in some sense in sampling and statistics, was
14   not directly in our industry. So there would
15   have -- there would have been a learning curve
16   there.
17              We had some concerns about his
18   ability to be task leader, proposal manager,
19   and other things we expect of a senior
20   statistician. We thought he could do some of
21   it, we weren't sure how well he could do it,
22   and because we were hesitant, we decided not to
23   take the chance.
24        Q.    And, in fact, when he was hired in

1   2005 and worked, those very same considerations
2   that caused you not -- those same weaknesses --
3       A.    Uh-huh.
4       Q.    -- were, in fact, when he was hired
5   played out to be true; is that right?
6       A.    Yes.
7       Q.    And so when you hired him, you
8   knew -- in 2005 or four, whenever you did it,
9   you knew that he was coming with those
10  potential weaknesses?
11      A.    Yes.
12      Q.    Did you tell him that you had those
13  concerns at any time before you offered him the
14  job?
15      A.    No.
16      Q.    Why not?
17      A.    It doesn't -- it is not my style to
18  establish a good working relationship by
19  telling somebody what I think is wrong them.
20  That's -- it's not generally what I do.
21      Q.    Okay.  Well, you knew that if he
22  came to work for you he was going to leave the
23  government, right?
24      A.    Yes.

1  BY MR. HANTZES:

2     Q.   Right. Okay. Thank you.

3     All right. To the best of
4 your recollection, what does the script say?

5     A.   That NORC has had some business
6 downturns related to the Qatar project and the
7 NIS project and needs to reduce payroll.

8     Q.   When did you type the script?

9     MR. BURNS: Objection, foundation.

10 BY MR. HANTZES:

11    Q.   Did you type the script?

12    A.   No.

13    Q.   Who typed it?

14    A.   I don't know.

15    Q.   Who gave it to you?

16    A.   I'm not sure. Someone in
17 management. It may have been human resources.
18 I'm not sure.

19    Q.   So you never told Mr. Woodruff
20 anything about what you're testifying to now
21 about the shortcomings of his performance,
22 right?

23    A.   No.

24    Q.   Why not?

1    A.    He was not being let go for cause.
2    The company needed to reduce payroll. That was
3    the first issue.
4    Q.    Why wasn't he brought back after
5    all the work came back on the NIS?
6        MR. BURNS: Objection,
7        foundation, assumes facts not in
8        evidence, mischaracterizes prior
9        testimony to the extent that that's
10       what you're doing, Nick --
11   BY MR. HANTZES:
12   Q.    Why wasn't he brought back?
13       MR. BURNS: -- prior testimony
14       in the depositions.
15   BY MR. HANTZES:
16   Q.    Why wasn't he brought back? Did
17   you ever make a request to bring him back?
18   A.    No.
19   Q.    Why not?
20   A.    There were many months before I
21   needed any additional employees.
22   Q.    You did need -- there came a time
23   when you needed additional employees, right?
24   A.    Very recently.