COPY

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEPHEN WOODRUFF,                )
                                 )
          Plaintiff,             )
                                 )
     vs                          )  No. 1:06-CV-00832(RJL)
                                 )
NATIONAL OPINION RESEARCH        )
CENTER,                          )
                                 )
          Defendant.             )


          The discovery deposition of

RACHEL HARTER, called by the Plaintiff, for

examination, pursuant to notice, taken before

GEANNA M. IAQUINTA, CSR, at Suite 2400, 131

South Dearborn Street, Chicago, Illinois, on

the 17th day of November, A.D., 2006, scheduled

to commence at 12:30 p.m., commencing at 12:31

p.m.

1          are.

2                    MR. BURNS:  Come on.

3                    MR. HANTZES:  Yes, they are.

4                    MR. BURNS:  No, but -- we'll

5          object to that, but go ahead.

6                    MR. HANTZES:  All right.

7          That's fine.

8     BY MR. HANTZES:

9          Q.    What did you have in mind for him

10    to work on, the RECS thing?

11         A.    Yes.  In 2004, yes.

12         Q.    Okay.  Well, who decided to hire

13    him?

14         A.    It was my recommendation.  I needed

15    approval, but it was my recommendation to hire

16    him.

17         Q.    Okay.  And you had in mind that he

18    would work on something outside of your

19    department?

20         A.    Most of my staff work on projects

21    outside of my department.  We are a support

22    department.

23         Q.    Okay.  Did you talk to Christine --

24    Krishna --

1          A.     Krishna.

2          Q.     -- Winfrey prior to hiring Steve?

3          A.     Yes.

4          Q.     Did you talk to her about hiring

5     Steve?

6          A.     Yes.

7          Q.     Did she interview Steve?

8          A.     Yes.

9          Q.     Okay.  And what did she say to you

10    about the resume -- I mean, about his

11    qualifications?

12         A.     I don't recall precisely what she

13    said.  I don't think she had an objection.

14         Q.     Okay.  Anything else that you had

15    in mind for him to work on?

16         A.     Not specifically.

17         Q.     How many man-hours was going to be

18    involved with the RECS matter?

19         A.     Initially, it would be full-time

20    and then after --

21         Q.     And initially is how long?

22         A.     A couple months maybe and then he

23    was supposed to cut back to half time.

24         Q.     And then what else did you have in

1    mind for Steve after he cut back to half time?

2        A.    Well, I wasn't sure.  Oftentimes, I

3    don't have a lot of lead time on some of the

4    projects that we need to support.  So I often

5    don't know what people are going to be working

6    on a few months out.

7        Q.    Well, why did you perceive a need

8    for him -- for his skills if the only thing you

9    had lined up for him was something to work for

10   two months?

11       A.    No.  It was far more hours than

12   that overall.  It was a longer project.  It was

13   full time for a couple of months and then half

14   time beyond that.

15       Q.    Right.  So at the time that you

16   hired Steve Woodruff, you only had in mind a

17   project in which he would work full time for

18   two months.

19             Is that a correct statement of

20   your testimony?

21       A.    Sounds right.

22       Q.    All right.  Then why did you hire

23   him?

24       A.    Because we need to support all the

1    much as we had originally.

2           Q.    How did Carol Winfrey (sic) feel

3    about the fact that Mr. Shin or Pedlow or

4    anybody else wasn't working on the project and

5    that Woodruff was being substituted?

6           A.    I think project directors are

7    generally nervous when they are working with

8    somebody new, but I think she also understood

9    the circumstances where NIS was getting a lot

10   of the existing staff, and so she was willing

11   to do this.

12          Q.    So going in, there was some

13   disagreement between your department and

14   Ms. Winfrey about the use of Mr. Woodruff; is

15   that fair?

16          A.    I wouldn't -- I don't know that I

17   would characterize it as a disagreement.  She

18   needed a senior statistician, and this was --

19   this was the name I put forth for her to work

20   with, and, as I said, project directors are

21   sometimes hesitant with somebody new, but I

22   wouldn't characterize it as disagreement.

23          Q.    And the amount of work on here for

24   Woodruff is how much total?  I can't read it.

1    Can you tell?  Is it the 1500?

2         A.    1593 hours.

3         Q.    And that's a couple of months work?

4         A.    No.  That's over two years of the

5    whole project.

6         Q.    Because it was going to become

7    half-time.  Okay.  Gotcha.  Okay.

8         A.    Excuse me.  A year and a half of

9    what was envisioned at that time.  It turned

10   out to be two years, but it was envisioned to

11   be about a year and a half.

12        Q.    Okay.  So as it turns out,

13   Ms. Winfrey -- well, describe Ms. Winfrey's

14   judgment as to the quality of work performed by

15   Steve.

16        A.    I didn't receive much feedback from

17   her.  She did come to me once in, I'm guessing,

18   April --

19        Q.    Okay.  In April.

20        A.    -- and expressed concern about a

21   matter with the client meetings.  He had

22   proposed an idea, it wasn't a bad idea, but it

23   was rejected by the client, and he kept

24   bringing it up, and she was concerned about

1    STATE OF ILLINOIS  )
                         )  SS.
2    COUNTY OF C O O K   )

3

4              I, GEANNA M. IAQUINTA, do hereby

5    certify that heretofore, to-wit, on the 17th

6    day of November, A.D., 2006, personally

7    appeared before me at Suite 2400, 131 South

8    Dearborn Street, in the City of Chicago, County

9    of Cook and State of Illinois, RACHEL HARTER, a

10   witness, called by the Plaintiff in a certain

11   cause now pending and undetermined in the

12   United States District Court for the District

13   of Columbia, wherein STEPHEN WOODRUFF is the

14   plaintiff and NATIONAL OPINION RESEARCH CENTER

15   is the defendant.

16             I further certify that the said

17   witness, KIRK WOLTER, was by me first duly

18   sworn to testify the truth, the whole truth and

19   nothing but the truth in the cause aforesaid;

20   that the testimony then given by her was by me

21   reduced to writing by means of shorthand in the

22   presence of said witness and afterwards

23   transcribed upon a computer, and the foregoing

24   is a true and correct transcript of the

1    testimony so given by her as aforesaid.

2              I further certify that the reading and

3    signing of said deposition was reserved by the

4    witness.

5              I further certify that the taking of

6    the deposition was pursuant to notice, and that

7    there were present at the taking of the

8    deposition the aforementioned parties.

9              I further certify that I am not

10   counsel for nor in any way related to any of

11   the parties to this suit, nor am I in any way

12   interested in the outcome thereof.

13             In testimony whereof I have hereunto

14   set my hand and affixed my notarial seal this

15   25th day of November, A.D., 2006.

16

17   _____
     Geanna M. Iaquinta, CSR

18   Illinois License No. 084-004096

19

20

21

22

23

24